Filed 4/17/14  P. v. Vasquez CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM VASQUEZ,<br><br>    Defendant and Appellant. | B241020<br><br>(Los Angeles County<br>Super. Ct. No. SA057247) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Larry Paul Fidler, Judge.  Affirmed.

Charlotte E. Costan, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Yun K. Lee and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant William Vasquez appeals from the judgment entered following his conviction by jury of five counts of first degree murder (counts one, two, three, four and eight), one count of willful, deliberate and premeditated attempted murder (count seven) and two counts of assault with a semi-automatic firearm (counts five and six). (Pen. Code, §§ 187, subd. (a), 664/187, subd. (a), 245, subd. (b).)[1] The jury also found the following allegations to be true: (1) the special circumstance that defendant committed first degree murder and was convicted of one or more counts of murder in the first or second degree; (2) the special circumstance that defendant committed first degree murder and intentionally killed the victim while defendant was an active participant in a criminal street gang and carried out the crime to further the gang's activities; (3) as to counts one, two, three, four, and seven, defendant personally and intentionally discharged a firearm, which proximately caused great bodily injury or death to the victim; and (4) defendant committed the crimes for the benefit of a criminal street gang, with the specific intent to promote, further or assist in criminal conduct by gang members. (§§ 190.2, subds. (a)(3) & (a)(22); 12022.5, subd. (a); 12022.53, subds. (b), (c) & (d); 186.22, subd. (b).) Although the prosecution sought the death penalty, two juries did not return a death verdict. Defendant received five terms of life without the possibility of parole, 140 years to life and 16 years, with the sentences to run consecutively.

Defendant contends: (1) the murder counts should not have been consolidated; (2) a photographic identification should have been excluded because it was obtained through an unduly suggestive process; (3) his right to due process was violated by allowing the identifications of witnesses who failed to appear at a court-ordered lineup; (4) the trial court's curative instruction with respect to those witnesses was inadequate; (5) the testimony of a defense expert was unduly restricted; (6) a motion for new trial should have been granted; (7) some of the convictions are not supported by the evidence; (8) cumulative error requires reversal; and (9) the matter must be remanded for the trial

---

[1] All further undesignated statutory references are to the Penal Code.

court to conduct an in camera hearing pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

Finding no error, we affirm the judgment.

**STATEMENT OF FACTS**

I

*The Prosecution Case*

*A. The Shooting of Hector Bonilla and Jonathan Hernandez[2] (Counts One and Two)*

On the evening of March 5, 2005, Santa Monica police officers and paramedics responded to reports of a shooting at the Moose Lodge in that city. The bodies of Hector Bonilla and Jonathan Hernandez were found on the floor of the main hall. They had been shot multiple times.

Earlier that day, Imelda Martinez was at the Moose Lodge attending a birthday party for her brother, Ruben. She saw defendant, whom she knew as Willie, at the party. Defendant had stayed at her home on occasion and was a friend of Ruben's. Defendant was wearing a long-sleeved shirt that Martinez described as "blood red." Martinez did not recall seeing anyone at the party wearing a similar type of red shirt.

Martinez was present in the Moose Lodge when Bonilla and Hernandez were shot. After the incident, Martinez was interviewed by detectives. She told them that when the shooting started, she went down toward the floor. As Martinez looked up, she saw something red and the first thought that came to her mind was that defendant was the shooter. Defendant's shirt was distinctive because "it was more casual and everybody else was a bit more dressed up." Martinez told detectives she saw the arm of the person in the red shirt and it was pointed downward at a 45 degree angle as the shots were being fired. Martinez acknowledged that the room was not well lit.

---

[2] Defendant, Jose Mojarro and Erick Nunez were jointly charged with the murders of Bonilla and Hernandez. Mojarro and Nunez were severed from the case and tried together prior to defendant's trial. We affirmed their convictions. (*People v. Mojarro* July 2, 2011, B223035) [nonpub. opn.].); (*People v. Nunez* (Sep. 29, 2010, B215886) [nonpub. opn.].)

On the night of the shooting, after Martinez returned home with her cousin, her cousin's husband and some friends, she told them that the person in red who was doing the shooting was the same individual who previously had stayed at her home. That person was defendant.

On July 25, 2005, Martinez identified a picture of defendant during an interview with detectives. Next to the picture, she wrote, "This is Willie, the one I saw at the party wearing a red shirt."

Ruben Martinez rented the Moose Lodge for his birthday party. He spent most of the time in the bar area during the party. He estimated there were approximately 100 guests at the location. At some point, Martinez heard popping sounds. He became aware that there had been a shooting. Earlier, Martinez saw defendant at the party. Defendant was wearing a red shirt and red cap. He stood out because he was wearing red. Martinez told police, "I'm shocked for him to be wearing that when the Bloods are the enemy. I don't know. I don't understand that. I mean, he must have had the balls that big to be doing something like that. Who's going to tell him anything?"

Martinez saw four or five members of the Santa Monica gang at the party. "They were yelling and shouting out their [] territory, their neighborhood." The members were walking around the dance floor and waving their bandanas.

Martinez knew defendant was a member of the 18th Street gang. Defendant was a friend in the neighborhood and had stayed at Martinez's home. When Martinez identified defendant's photograph for police, he did not tell them that he knew defendant. Martinez acknowledged he did not want to be present in court. Although he denied being frightened to give information, Martinez conceded he told police, "'You know how it is on the street. If you say a word, you get taken out.'"

A couple of days after the shooting, defendant came to Martinez's home. Defendant asked if the Moose Lodge had any surveillance cameras.

Salvador Ramirez was at the party. He saw defendant, someone he had encountered in the neighborhood on prior occasions, at the location. Ramirez knew defendant as Willie. Defendant was wearing a red shirt and a red baseball cap. They

4

exchanged greetings. Ramirez spent most of the time in the area of the bar and was there when the shooting broke out in the main room.

About a week after the shooting, Ramirez spoke to Imelda Martinez. She told Ramirez that she saw the shooter. She was not certain, but she thought the shooter was defendant because he was wearing a red shirt at the party, like the shooter. Ramirez did not recall seeing anyone at the party wearing a red shirt and a red hat other than defendant.

On March 20, 2005, approximately two weeks after the shooting, detectives showed Ramirez a six person photographic lineup. He selected defendant's photograph, indicating defendant was the person Ramirez knew as Willie.

Rachel Herrera, another guest at the party, arrived at about 9:00 p.m. and sat in the bar area. She went into the main room, wished Ruben Martinez a happy birthday and said hello to his sister, Imelda. At some point, a scuffle broke out. She testified at an earlier proceeding that four or five males were fighting. Herrera saw someone throw a chair and heard a sound "like firecrackers." She and others realized shots were being fired and they ran.

That night, Herrera spoke to police officers. She said one of the men she saw was dressed in red and wore a red baseball cap. This person approached the group that was fighting and shot a male multiple times. The victim immediately fell to the floor. The shooter stepped forward and fired more rounds into the prostrate victim. Herrera admitted she told an officer that she would not be able to identify the people involved in the fight because it was too dark inside the room to see their faces.

Herrera attended two live lineups. She did not identify any of the participants. The parties stipulated that defendant was in the second lineup Herrera viewed.

Diana Estrada arrived at the party and sat at one of the tables in the main room. She became aware of a commotion. Estrada told police she saw five or six male Hispanics fighting. Her boyfriend, Cuauhtemoc Estrada (they were married at the time of trial and we will refer to each by his or her first name) saw four or five individuals striking one male. The table at which she and her boyfriend were sitting was shoved

5

against them. They got up and went under a nearby piano. Both Estradas saw two men shooting. One of the shooters was wearing a red shirt and red hat. He was firing at a man who was on the floor. Diana saw a second shooter, who was wearing a white shirt and jeans. She focused more of her attention on the man in red.

After the shooting stopped, the perpetrators ran out of the exit that led to the street. Diana became aware that Cuauhtemoc had been shot in the right leg. He went to a hospital. By the time of trial, he had not yet fully recovered from his wounds. At times, he still had pain in the leg.

Diana "more or less, kn[e]w…what [the man in red] looked like." She described him as being a light skinned Hispanic in his late teens to early 20's, with a small mustache. He was between five foot three and five foot six and "it did not look like he weighed a lot." She was shown a six-pack photographic lineup by police. Diana circled defendant's photograph and wrote, "'This photo resembles the one who was – shot the older victim, which is the one with the red shirt.'" At a prior proceeding, Diana said she was unable to identify the shooters.

Cuauhtemoc saw that one man engaged in the fight stood out from the others because he was dressed in red. He was shown a six-pack and identified one of the shooters. The person Cuauhtemoc selected was not the man wearing red.

Another party guest, Cesar Banuelos, was in the bar area with his wife and some friends. He noticed a large group of men near a pool table, but did not notice anything out of the ordinary. He went to the restroom. While there, he heard the sound of gunfire.

After the incident, Banuelos was shown some photographs. He circled defendant's photograph and wrote, "'It looks like the guy wearing bright red at the Moose Lodge Party.'" He did not see anyone else at the party wearing a red shirt. The person depicted in the photograph looked like a person named Willie, whom Banuelos had seen in the neighborhood. At trial, Banuelos identified defendant as Willie.

Ramon Mendoza helped the DJ set up for the party and spent most of the time seated on the stage. While there, he noticed a disturbance near the main door. Three or four men were beating on one individual. After the individual was knocked down,

6

another male approached the group with a raised chair. To Mendoza, it appeared as if that person was attempting to throw the chair at the group involved in the fight. One of the males who was inflicting the beating took out a gun and shot the person with the chair, who immediately dropped to the floor. The gunman then turned and shot the male who was being beaten. A second male produced a gun and began to fire at the same male. The first gunman returned to the victim who had raised the chair and shot him as he lay on the floor. That gunman looked toward Mendoza and fired two or three shots at him. Mendoza was not struck. He ducked down on the stage and continued to hear gunfire.

On March 8, 2005, Mendoza was shown a photographic lineup. He identified a photograph of the person he called the first shooter and wrote, "'This looks like the guy I saw shooting at the Moose Lodge.'" Mendoza described the shooter as being five-seven to five-eight, skinny, 17 or 18 years old and wearing a blue cap.

On March 25, Mendoza was shown a second photo spread. He circled one picture and wrote, "'He looks like one of the guys I saw shooting inside the Moose Lodge party.'" Mendoza looked at a third six-pack. He selected defendant's photograph and wrote, "'He looks like the guy who initiated the fight at the Moose Lodge.'" Mendoza said this person was wearing a red shirt at the party.

Mendoza admitted that he withheld certain information from the detectives during the photo showups. When he was subpoenaed to testify, he realized he was going to be sworn to tell the truth. As he was waiting to testify at the preliminary hearing, Mendoza told Detective Lewis that he recognized the second shooter as being the male wearing the red shirt, whose picture Mendoza had identified. Mendoza said he was afraid to identify the individual at the photo showup because he seemed like he was the leader of the group who had participated in the fight at the Moose Lodge. In court, he identified defendant as the second shooter. He described defendant as being about "five-five, five-six, stocky build. He was a little shorter, heavier set than the first shooter." Mendoza said he remembered the events at the Moose Lodge as if "it was yesterday."

Mendoza acknowledged that when he was interviewed shortly after the incident, he mentioned only one shooter. He also conceded that he failed to say there was a second shooter on the first three occasions that he spoke to detectives.

Crispin Yanez attended the birthday party. Yanez saw defendant, whom he knows as Willie, at the party. When asked by detectives what defendant was wearing, Yanez replied, "Uh, it was really hard not to miss him. He was wearing a red [] outfit, I think." The outfit consisted of a red shirt and a red hat with the letter "A" on it.

Yanez testified that he was standing near a pool table when he heard gunshots; however, he did not see the shooting, claiming he was drunk. During an interview with Santa Monica detectives, Yanez said he heard the shooting, turned around and, because the guests had gotten down on the floor, he had a clear view of defendant shooting at an individual. "'The guy was already dead, and Willie kept on walking towards him shooting until the gun, I guess, I don't know . . . .'" Yanez told the detectives defendant shot the larger victim. He also saw a second shooter who was firing at another man who was on the ground.

At trial, Yanez claimed he lied to the Santa Monica detectives, saying he told them what they wanted to hear because he was being investigated for a double homicide by Los Angeles police. After being interviewed by Los Angeles Police Department detectives, he was released. Yanez admitted that after he was dropped off at home, he and his family drove to the Santa Monica police department to speak with detectives. He denied telling police that he was afraid of defendant, although he acknowledged saying he was concerned for his family.

On August 19, 2005, Yanez was shown a six-pack by police. He circled defendant's photograph and wrote, "'I saw him shooting at the guy in the Moose.'" He looked at a second set of pictures and circled one photograph and wrote, "I saw him walk into the Moose and []shooting at a guy [who] fell down." Yanez saw the second man walk into the Moose with defendant. Yanez told police the second man was wearing a black shirt.

8

Defendant is a friend of Yanez's brother, Jose. In 2005, Jose affiliated with the 18th Street gang. Yanez believed defendant also was affiliated with that gang because he hung out with Jose.

Yanez was upset when served with a subpoena. He denied that he started to cry. Soon afterward, he went to Arizona. He claimed that he left the area for reasons unrelated to the court proceedings. A warrant was issued when Yanez failed to appear at the preliminary hearing. Detective Lewis called and left several messages for Yanez, who claimed he did not receive them. Eventually, Lewis went to Arizona, took Yanez into custody and returned to Los Angeles. Yanez denied that he repeatedly told the detective that he was fearful.

Los Angeles Police Department Detective Timothy Grimes was one of the detectives who interviewed Yanez in connection with an unrelated double homicide. When Grimes began the interview he was unaware of the Moose Lodge shooting. His partner was told by the officer who arrested Yanez that Yanez may have some information concerning that incident. After Grimes concluded his interview related to other crimes (which we discuss, *infra*), he asked Yanez what he knew about the Moose Lodge killings.

Grimes showed Yanez several six-pack photographic lineups that included members of the 18th Street gang. Yanez selected a photograph of defendant and told Grimes that Willie did the shooting. During the course of the interview, Yanez stated, several times, that he was in fear for having provided information to the police. A tape of Grimes's interview of Yanez was played for the jury.

Santa Monica Police Detective Richard Lewis interviewed Yanez shortly after he was released by Detective Grimes. Lewis spoke to Yanez at the Santa Monica station after Yanez and his girlfriend arrived there. The interview was videotaped and the recording was played for the jury.

Yanez told Detective Lewis and Detective John Henry that defendant, who was wearing a red shirt and red baseball hat with the letter "A" on it, was one of two shooters at the Moose Lodge. Yanez described how defendant walked toward one of the victims

9

who was lying on the floor and continued to shoot him. Yanez estimated he had seen defendant on 30 prior occasions, as defendant would visit Yanez's brother. Yanez expressed concern that defendant and the other shooter would learn he had given information to the police, noting the two men were "ruthless."

Yanez saw a series of photographic lineups. After viewing the first, he circled photograph number five, identifying Jose Mojarro as the second shooter. In the second six-pack, he selected picture number three, a photograph of defendant.

Lewis said he personally served Yanez with a subpoena at his residence. Yanez began to cry and said he did not want to testify. He maintained that he had helped the police so the perpetrators could be caught; however, he wanted no further part in the case. After Yanez was subpoenaed, he fled to Arizona. The detectives received a warrant for his arrest and retrieved Yanez from Phoenix after he was arrested during a traffic stop. On the trip back to Los Angeles, Yanez again began to cry, saying he was scared for himself and his family.

Krizna Ayala went to the party with the father of her three children, victim Hector Bonilla. They arrived shortly after 10:30 p.m. At some point, Ayala went to the restroom and while inside, she heard a number of gunshots. When she came out of the restroom, the gunfire had ended. She saw Bonilla on the floor bleeding.

A few weeks later, Ayala was shown six-packs by the police. She selected two photographs and stated she saw the persons depicted at the party. Ayala said one was wearing a blue hat and a t-shirt at the time; the other was dressed in a red shirt and red hat. She said one of the persons in another photo array might have been present as well.

Christian Solares's testimony from the preliminary hearing of defendant, Jose Mojarro and Erick Nunez was read to the jury. Solares was in custody, having been convicted of attempted murder. He was at the party at the Moose Lodge and saw his friends Jonathan Hernandez and Hector Bonilla there. Hernandez, Bonilla and Solares were members of the 17th Street Santa Monica gang. After the shooting, Solares saw Hernandez and Bonilla lying dead on the floor.

10

About a month later, Solares was interviewed by Detective Lewis. He did not recall telling Lewis the following: (1) he heard someone yell that Hernandez was being beaten; (2) he looked over and saw Hernandez being hit by several individuals, including one wearing a red shirt and red baseball cap; (3) Hector Bonilla starting running toward the fight; (4) the man in the red shirt pulled a handgun and starting firing; (5) a second individual produced a gun and shot several times; (6) the man in red continued to fire at Hernandez and Bonilla after they were lying on the floor; (7) the man in red was an 18 to 20 year old, thin, light-skinned male Hispanic, about five-nine or five-ten; (8) the man in red shot Jonathan Hernandez; and (9) he, Solares, could get shot for saying anything to police.

Detective Lewis showed Solares a six-pack photographic lineup. Solares circled a picture of Mojarro and wrote that Mojarro was at the party talking to one of Solares's friends.

Solares's interview was videotaped and the tape was played for the jury.

Alfonso Lozano is a Santa Monica Police officer. He is familiar with the gangs in Santa Monica. The Santa Monica 17 gang is a clique of the Santa Monica 13 gang. Jonathan Hernandez and Hector Bonilla were members of the Santa Monica 13 gang and Santa Monica 17 clique. In 2005, the Santa Monica 13 gang and its clique were rivals of the 18th Street gang.

Doctor Ogbonna Chinwah, a deputy medical examiner for the Department of Coroner for Los Angeles County, performed the autopsy on Jonathan Hernandez. He ascribed the cause of death to multiple gunshot wounds (Hernandez suffered 17 wounds). The parties stipulated that marijuana and methamphetamine were found in Hernandez's system.

Doctor Raffi Djabourian is also a deputy medical examiner. He performed the autopsy on Hector Bonilla. Bonilla suffered eight gunshot wounds and succumbed as a result. He had the tattoo "SM" on his body. The parties stipulated that Bonilla had a blood alcohol level of .05 percent. In addition, cocaine and marijuana were found in his system.

11

*B. The Shooting of Alex Haro (Count Three)*

On January 27, 2002, Salina Redondo attended a backyard party at a home where she saw her friend Alex Haro. She had finished dancing with Haro when she noticed some individuals entering the yard through a side gate. Suddenly, the guests began running toward the house and out of the yard. Redondo realized the people were trying to get away from a man wearing a baseball hat, whom she identified as defendant. He was casually walking into the yard with a gun at his side. She made eye contact with defendant and ran toward the house. As she was entering the home, Redondo heard six to nine gunshots. After the shooting stopped, she was scared, left the residence and drove away. She did not talk to police that night.

Some weeks after the shooting, Redondo was working at an In-N-Out drive-thru window when she saw defendant in the passenger seat of a car that drove up. After completing the transaction with the driver, she left the window in a panic. Redondo was very concerned because she had worked at that location for about a year and had not seen defendant there before.

Approximately a week and a half later, she was at work when she saw defendant again. On this occasion, he walked into the restaurant. Redondo took his order at the counter. After he gave her money, Redondo left the counter and walked to the back of the restaurant. Defendant sat at a table with another individual and ate. Redondo waited until they left the restaurant before returning to the counter.

On May 22, 2002, Redondo met with detectives and viewed a photographic lineup. She selected defendant's picture and said he was the person with the gun, whom she saw in the backyard at the party and who twice came to her place of employment. When Redondo spoke to detectives that day, she held back some information because she was scared. She wanted to limit her involvement in the case because defendant had shown up twice at her job. Since the time of that first interview with detectives, Redondo realized she had to come forward and divulge all she knew because Alex Haro was a longtime friend.

12

Redondo acknowledged that she had been asked to attend a lineup on September 20, 2007 and October 30, 2007. She failed to appear at either.

Cesar Navarro was another guest at the party. He knew Haro in high school, but had not seen him in the four and a half years since graduation. Navarro and Haro had a conversation, trying to catch up on each other's life. Later, Haro was dancing when Navarro noticed two males walking toward the back of the yard. One of the males rushed forward and yelled, "Fuck Caca City." That male, who appeared angry and aggressive, rapidly approached a "young kid" who was wearing a hat with the letter "C" on it and knocked the hat off his head. Haro came over "to defend" the youngster and socked the aggressive male, who then "pulled out a gun and just started unloading." The shooter was inches away from Haro as he fired. Haro died as a result of the shooting.

After the gunfire, the crowd began to scatter. Navarro froze. A few seconds later, he heard two more gunshots.

Navarro described the shooter as "not tall at all. Probably about five-five, five-six at the most" and "really thin." He was wearing a baggy charcoal gray hooded sweater and a fitted, navy blue Yankee hat. The male was Hispanic and had a very light mustache.

On February 20, 2002, Navarro was interviewed by police. He was shown a six-pack photographic lineup. He circled defendant's photograph and wrote that he "'looks like the suspect . . . that was wearing a fitted New York hat at the time where he had a gun and shot towards Alex Haro.'" He was one hundred percent certain of his identification at the time.

In 2007, Navarro attended a live lineup. The parties stipulated that defendant was in position number four and Navarro selected the person in position number five.

Carlos Diaz was present at the party where Haro was shot. Diaz had known Haro since high school. Both were members of the Culver City Boys gang. On the night of the party, Diaz did not see any other Culver City Boys members.

Diaz walked to the front of the house to meet some girls who had arrived. He professed to not remember anything else from that night. He conceded that he told police

13

on the night of the shooting: (1) he saw some bald-headed guys arguing; (2) someone in the group said everything was cool; (3) as Diaz walked toward the backyard, three of the guys who had been arguing followed; (4) the three had guns; (5) one of the three used a derogatory term for Culver City Boys by asking "Who's from Caca City?"

Diaz said he heard shooting coming from the backyard and saw people running toward the front of the house. Diaz went into the backyard to look for Haro because he did not see him run out of the backyard.

In March 2002, detectives showed Diaz a six-pack photographic lineup. He selected defendant's photograph and wrote that he "'looks like one of the people that [came] to the party with the handgun and hood on his head.'" At trial, he claimed he circled the photograph because the detectives pointed that person out by tapping on the picture.

Los Angeles Police Detective Richard Gordon and his partner Detective Razanskas were the detectives who conducted the March 2002 interview of Diaz. Detective Gordon denied that anyone tapped on defendant's photograph during the photo showup.

In September 2006, Diaz was arrested. While in custody, an inmate asked him his name. Diaz replied he was "Scrappy" from Culver City. The inmate said he was "Crook" from 18th Street. He also said to Diaz, "You are Carlos Diaz." Diaz had never spoken to the man before. He denied telling detectives the day before he was to testify that defendant was the inmate who had spoken to him in jail.

Diaz admitted he was currently in custody, having been convicted of commercial burglary. He also acknowledged that he did not attend two live lineups.

Erica Diaz also attended the backyard party. She noticed a male walking through the yard and the guests were getting out of his way. Diaz did not recall the description of the male that she gave to detectives. The male was screaming, "Who's from Caca?" He slapped a hat that had the letter "C" on it off the head of another guest. Diaz then heard gunfire.

14

In April 2002, Diaz was shown a six-pack photographic lineup. She selected a picture of defendant and wrote that the person depicted looked like the male who was screaming at the party. Detective Gordon said she described the shooter as being a male Hispanic, about five-five to five-six in height and roughly 130 pounds. He was 16 to 20 years old with a thin mustache and was wearing a black baseball cap, black sweatshirt and black hooded sweatshirt. She told Gordon the person removed a handgun from his waistband area and fired three to four shots at Haro.

She failed to attend two live lineups.

Los Angeles Police Sergeant Jason Azpeitia arrived at the scene of the shooting in a response to a radio call. While at the location, he observed two individuals, Carlos Diaz and Daniel Mendez, arguing in the street. Azpeitia saw an individual with a gunshot wound to his leg on the porch of the residence.

Detectives Gordon and Razanskas, were the investigating officers. They responded to the crime scene at the backyard of the residence. Among the items located in the yard that were booked into evidence were a .40 caliber cartridge casing, bullet fragments, and a .22 caliber cartridge casing that was found by one of the residents. In the driveway of the location, six .45 caliber cartridge casings were found. A vehicle parked in the driveway had what appeared to be bullet strikes. The strikes indicated that they were made by shots fired in the direction of the street. A bullet fragment was discovered in the street.

Doctor Louis Pena, a deputy medical examiner for the Los Angeles County Department of Coroner, performed the autopsy on Alex Haro. Haro was shot three times, twice in the torso and once in the back of the head; each of the wounds was fatal. Two of the wounds had stippling, indicating that the gun was fired from a range of a couple of inches up to two feet away from the victim.[3]

---

[3] A criminalist determined that one of the projectiles recovered by Doctor Pena was consistent with a .22 caliber round.

*C. The Shooting of Jesse Becerra and Raymundo Ortiz (Counts Four and Five)*

On September 23, 2005, Raymundo Ortiz attended an outdoor birthday party at a residence on 21st Street. He left the location to urinate in a nearby alley, accompanied by a friend named Santiago Rosales. After Ortiz relieved himself, he stopped to wait for Rosales. A black SUV drove up. An occupant of the SUV asked a third person (later identified as Jesse Becerra), who was standing near Ortiz, where he was from. Becerra replied, "'Santa Monica.'" Ortiz felt something bad was going to happen because "'somebody just doesn't reply and respond another hood or whatever [] if they are not from there.'" Ortiz was aware that he was not in Santa Monica at the time.

The SUV pulled away. A short time later, Ortiz saw a person running in his direction and firing a weapon. He believed it was the same individual who had asked Becerra where he was from. Becerra fell. Ortiz and Santiago hit the ground to get cover. Ortiz was shot in the leg. The man ran past and kept firing at Becerra's head as he lay on the sidewalk.

On October 17, 2005, Ortiz was shown a six-pack photographic lineup. He circled defendant's photo in position number two and wrote: "'It could be number 2. It looks like his face.'" At the time, Ortiz was certain he was identifying the person who shot Becerra and him; however, he acknowledged he testified at the preliminary hearing that he was not one hundred percent sure.

On October 30, 2007, Ortiz attended a live lineup. The parties stipulated that although defendant was in the lineup, Ortiz selected another individual.

Santiago Rosales was with Ortiz on the sidewalk. A black SUV came up. Someone inside the car asked the victim where he was from in a stern, demanding voice. The victim identified the gang he was from. The vehicle pulled away. Rosales and Ortiz started back toward the party and the victim passed them and continued down the sidewalk in the direction of the alley. As the victim passed, shots were fired from behind Rosales. Rosales turned and saw the gunman running toward them and shooting. Rosales jumped back. The gunman ran past him toward the victim, continuing to fire his

16

weapon.  After the shooter left, Rosales saw Ortiz on the ground.  The shooter was the same person who had asked the victim where he was from.

On September 30, 2005, Rosales was shown a photographic lineup.  He circled a photograph of someone other than defendant and wrote the person had the same bone structure as the shooter.

Los Angeles Police Officer Hector Marquez was the first officer to respond to the location.  There were approximately five people surrounding a victim who was lying on the ground.  The responding ambulance attempted to provide first aid to that individual.  A second victim, who had been shot in the leg, was in the driveway.

Los Angeles Police Detective Louis Turriaga was called to the scene.  He was told there had been a party at the location prior to the shooting.  21 cartridge casings were located near the victim, one in the back of his shirt.

Doctor Chinwah performed the autopsy on Jesse Becerra.  Becerra sustained 20 gunshot wounds, nine to the back of the head.

*D.  The Shooting of Donell Kipp (Count Six)*

On January 26, 2003, Lisa Briseno went to Apartment 201 in a building on Glendon Avenue where she socialized with three girlfriends and three males, one of whom was defendant.  Briseno had seen defendant on several prior occasions.  The group partied in the apartment.  Alcohol and drugs were consumed.  After she had been at the location for several hours, she saw defendant standing in the living room and clicking two guns that he was holding.  He seemed "paranoid" because a helicopter was flying overhead.  Defendant thought someone had called the police.

Briseno got up and went into the kitchen.  She made some soup, hoping it would sober defendant up.  When she tried to bring him the soup, defendant pointed a gun at her and said not to come any closer.  He started pointing both guns at the others, who were sitting on two couches.  Briseno heard a gunshot and noticed one of the males was holding his shoulder and bleeding.  (The parties stipulated that the person shot was Donell Kipp.)

17

Defendant told Briseno she was going to drive him somewhere. She offered him the use of her car, but he demanded that she take him. At gunpoint, defendant led Briseno, her friends and Kipp to Briseno's car. Briseno could not drive, so one of her friends drove to a location where defendant wanted to be dropped off. After defendant left the vehicle, Kipp was driven to the hospital. Briseno did not call the police.

That evening, police officers came to her house. She told them what had occurred earlier in the day. About a year later, she was shown a photographic lineup and identified defendant as the person who shot Kipp.

Candy Betancourt, who was present in the apartment with Briseno, confirmed that defendant shot the victim. In October 2005, she identified defendant's photograph from a six-pack. Betancourt could not say for sure whether defendant was in the courtroom during her testimony. She acknowledged that in January 2003 she viewed a photographic lineup that included defendant's picture and did not identify him.

After the incident, Betancourt was interviewed by Los Angeles Police Detective Jeff Nolte. She was afraid to speak to police because she knew the incident was gang related and believed her family would be killed if she cooperated with the authorities. She knew defendant was a member of the 18th Street gang and had seen him on prior occasions. Betancourt identified defendant's picture from a photographic lineup and said he was the shooter. She was confident she would be able to identify him if she saw him again.

Ruth Betancourt offered similar testimony; however, she did not recall that anyone directed her (she was the driver) to go to a particular location. She also identified defendant's photograph from a six-pack, saying he looked like the shooter.

According to Detective Nolte, Ruth also said that she was afraid to cooperate. She stated that defendant opened fire in the apartment, ordered the occupants to leave with him and told her where to drive after the group got into Briseno's car. Ruth identified defendant's photograph and said he was the shooter.

Los Angeles Police Criminalist Harry Klann responded to the crime scene. He observed what appeared to be blood stains that started in the street and continued on the

18

sidewalk on the side of the apartment building. The stains were photographed. The blood trail led up the stairs, into the building, down a hallway and to an open apartment door.

Klann went inside the apartment. No one was present. Three cartridge casings (two .9 millimeter and one .45 caliber) were located on the floor in front of a couch. There were bloodstains on the couch cushions. A third .9 millimeter cartridge casing was found on the ground in front of a television set. A spent bullet was retrieved from inside a couch cushion. Live rounds of ammunition, several magazines for a semiautomatic firearm, firearms and drugs also were recovered.

*E. The Shooting of Mark Brown (Count Seven)*

On December 3, 2003, Mark Brown was standing outside a residence on La Salle Avenue. Brown had lived in that neighborhood all of his life and, as a Rollin 20's gang member, he knew that his gang controlled the area. The location where Brown was standing was a place "where the homies kick it at." He noticed a male, whom Brown identified as defendant, jogging in his direction. A girl came up to Brown and asked for a dollar. As he went into his pocket to get some money, Brown's keys dropped to the ground. He went down to pick them up when he noticed a black object close to his face. Brown threw his hands up and grabbed defendant's wrist. Defendant was holding a gun.

Brown and defendant struggled for control of the weapon. Defendant was pulling the trigger. Brown was struck in the shoulder by a bullet. The men fell and the gun hit the ground. Brown dove under a nearby car. Defendant retrieved the firearm, and continued to fire while shouting "'fuck slobs.'" Brown said the word "slob" is a term used to disrespect Blood gang members, which includes those who belong to the Rollin 20's. After five or six shots, the gunfire ceased. People in the residence, including Sheba Robinson, ran outside.

Brown was familiar with the 18th Street gang and stated that 18th Street and the Rollin' 20's Crips were "always at war." Brown had seen defendant on prior occasions when Brown and fellow gang members drove through 18th Street territory during their

19

"scouting" trips looking for 18th Street members to kill and when Brown was at the shooting range.

On December 16, 2003, Brown viewed a photographic lineup and identified defendant as the individual who shot him. He also identified defendant at a live lineup.

At the time of trial, Brown was in prison for selling narcotics. He had prior convictions for shooting at an inhabited dwelling, attempted robbery, seven robberies, and the selling of narcotics.

On the night of December 3, Sheba Robinson was walking home from the market. A red vehicle Robinson believed to be an Acura approached and stopped near her. The driver yelled, "'Hey, do you know where any 20's are at?'" Robinson did not respond and continued walking. There were four Hispanic males in the car. One stood out in her mind.

Later, while Robinson was at home, she heard gunshots and then someone knocking on the front door. When Robinson opened the door, Brown collapsed on her living room floor. Robinson called 911. She knew Brown from the neighborhood and was aware that he was a long time member of the Rollin' 20's.

In October 2005, Robinson spoke to the police about the shooting for the first time. She viewed a photographic six-pack. She identified defendant's picture and said he looked like the driver of the Acura. At trial, Robinson stated she was 50 percent certain that the person whose picture she selected was the driver of the car.

Los Angeles Police Officer Kevin Beard arrived at the scene. He observed Brown in the parking lot, suffering from two gunshot wounds. Beard requested an ambulance, set up the crime scene by taping off the area and attempted to locate physical evidence.

Detective Jeff Nolte responded to the location. He saw numerous .9 millimeter cartridge casings and bullet impacts on the building and nearby vehicles. The detective spoke to Mark Brown shortly after the shooting. Brown said Sheba Robinson called his name to warn him as the shooter approached. (Robinson denied doing so.)

*F.  The Shooting of Kevin Walton (Count Eight)*

That same evening, Detective Nolte arrived at the scene of a second shooting at about 7:45 p.m.  He saw Walton, who had suffered multiple gunshot wounds, lying in the street.  Six .9 millimeter cartridge casings were located in the street near Walton's body.

Walton's body was found approximately a quarter to a half mile from where Brown was shot.  It took about one minute to travel between the two locations by car.  Sheba Robinson called 911 to report the Brown shooting at 6:17 p.m.  The 911 call reporting Walton's shooting came in two minutes later.

Doctor Irwin Golden performed the autopsy on Kevin Walton.  Walton had three gunshot wounds; one to the neck, another to the jaw and a third to the knee.  The wounds to the neck and jaw were fatal.


*G.  Gang Expert Testimony*

Officer Teodoro Urena had personal contact with defendant on approximately six occasions.  Defendant is a self-admitted member of the Alsace clique of the 18th Street gang.  All blood gangs, which include the Rollin' 20's, Santa Monica Trece and the Culver City Boys, are rivals of 18th Street.  During his contacts with defendant,  Urena attempted to counsel defendant to get out of the gang.

Urena believed the Moose Lodge shooting started an active feud between 18th Street and Santa Monica Trece.  Urena also was aware of shootings between 18th Street and the Rollin 20's and 18th Street and the Culver City Boys.

Los Angeles Police Officer Edgar Hernandez worked the gang unit from 2001 to 2006, focusing exclusively on the 18th Street gang.  In 2005, the 18th Street gang had approximately 3,000 documented members in the Rampart Division and 5,000 in Los Angeles county.  Alsace was one of the cliques of the gang.  18th Street is a rival to all gangs in the surrounding areas.

According to Hernandez, respect is "everything" to the culture of 18th Street.  A member who puts in work for the gang escalates his or her level of respect within the gang.  Disrespect of an 18th Street member sometimes leads to murder.

21

Hernandez identified photographs of Jose Mojarro and Erick Nunez. Hernandez testified at their preliminary hearing and trial. Mojarro had a tattoo representing the Alsace clique. Members of the Alsace clique often wear an Atlanta Braves hat, which has a letter "A." Nunez had a tattoo representing the Smiley Drive clique, also affiliated with 18th Street. Its members wear San Diego Padre hats. Hernandez opined that both were members of the 18th Street gang, with Mojarro in the Alsace clique and Nunez in the Smiley Drive clique. Hernandez also identified a photograph of defendant, whom he believed was a member of the Alsace clique of 18th Street.

Presented with a hypothetical mirroring the facts of the shooting at the Moose Lodge, Hernandez opined that Hernandez and Bonilla were killed by 18th Street gang members acting in concert for the purpose of benefitting the gang.

Hernandez was asked about the killing of Alex Haro. Based on a hypothetical outlining the events that led to that shooting, the officer stated that the crime was carried out for the benefit of the 18th Street gang. Specifically, Hernandez noted that defendant entered the party uttering a phrase that disrespected the Culver City gang, Culver City was having a party in 18th Street territory and the victim, Haro, was a member of the Culver City gang.

Hernandez believed the shooting of Mark Brown also was for the benefit of the gang. Brown was a member of the Rollin 20's gang, a rival of 18th Street. Defendant approached Brown uttering a disrespectful term for Rollin' 20 members and shot Brown in front of a known Rollin 20's hangout. Shooting a gang member in the victim's territory enhanced the shooter's gang's reputation for violence and garnered respect for the gang.

The prosecution asked Hernandez to consider the facts relating to the shooting of Kevin Walton, also a Rollin' 20's member. Walton was shot minutes after defendant attempted to kill Brown. Hernandez said Walton's shooting was carried out with the intent to benefit the gang. Defendant was in the process of eliminating as many rivals of 18th Street as possible.

22

*H. The Forensic Evidence*

Thomas Matsudaira is a forensic scientist working in the firearms and tool mark unit of the Orange County laboratory. The lab has a contract with the city of Santa Monica. He examined 26 cartridge casings and 15 bullet or bullet fragments, referred to as projectiles, related to the Moose Lodge shooting. With respect to the casings, Matsudaira determined that 12 were fired from one firearm and 14 were fired from a second weapon. The casings and projectiles were fired from a .9 millimeter semi-automatic pistol.

Starr Sachs was employed for 20 years in the Los Angeles Police Department's crime lab as a firearms examiner. She test fired a .226 Sig Sauer that was recovered from defendant when he was arrested. She examined 21 cartridge casings from the Becerra shooting and determined that seven of the casings were fired from the Sig Sauer. The other 14 casings were fired from a second weapon.

Sachs also examined three cartridge casings recovered from the scene of the Kipp shooting and six casings recovered at an unrelated shooting involving a victim named Reddix. The same gun fired the casings left at both shootings.

Sachs examined nine .9 millimeter cartridge casings from the Brown shooting. All were fired from the same gun.

Sachs examined seven casings from the Walton shooting. They were fired from the same gun. The Brown and Walton casings were fired from the same weapon. The Walton and Reddix casings were fired from the same gun.[4]

Melissa Popobic is employed as a senior forensic print specialist by the Los Angeles Police Department and assigned to the latent print unit. The recovery of latent fingerprints is dependent on the surface in question. The smoother the surface the more likely prints will be discovered and lifted. Firearms are not a good source for lifting

---

[4] Although Sachs offered no opinion with respect to Alex Haro's murder, she acknowledged that another examiner wrote in a report that two of the projectiles taken from Haro's body were fired by different weapons. Sachs thought the evidence was inconclusive.

23

prints, due to the texture of the grips, the presence of oil and the heat generated by the firing of the weapon. Popobic was able to lift prints from firearms less than ten percent of the time and from cartridge casings less than one percent of the time.

## I. Defendant's Arrest

Jeff Hofmeyer is a Los Angeles Police Department detective. On October 13, 2005, he was assigned to the FBI fugitive task force and conducted a parole search at the apartment of Daniel Mendez, an associate of defendant. Mendez is a member of the Alsace clique of the 18th Street gang. Between 5 a.m. and 6 a.m., Hofmeyer and his team, including Mendez's parole officer, knocked on the front door of Mendez's fourth floor apartment. People inside were moving and talking. Eventually, after team members continued to pound on the door, a female let them inside. Mendez was not inside the apartment.

One of the team members, Lieutenant Peter Zarcone, noticed a window. He pulled the curtain back and opened the window. He observed defendant crouched down on the window sill. Zarcone grabbed defendant by the shoulders and pulled him into the apartment. Zarcone searched defendant and found a holster attached to his waistband that contained a fully loaded .226 Sig Sauer handgun. In his pockets, defendant had three loaded magazines and a baggie with loose rounds of ammunition.

At first, Zarcone thought defendant was Mendez. Another officer looked at defendant and noted that he did not look like Mendez. The officer asked defendant, "'You're Willie Vasquez, aren't you?'" Defendant replied, "'My name is William. You guys have been looking for me for a long time, haven't you?'" He then said, "'I knew someone snitched on me. Fuck a snitch. I hate a snitch. You just remember it's you guys' fault somebody's going to die.'" As Hofmeyer and others escorted defendant out of the apartment building, defendant shouted, "'Fuck all snitches. I hate rats. Fuck the rats. Alsace. Alsace.'"

Hofmeyer transported defendant to the police station. In the car, defendant said, "'I know you guys have been looking for me for a long time. Shit, I'm the best.'"

24

Officer James Ross, who was also in the vehicle, described defendant's demeanor as boisterous and arrogant.

After arriving at the station, defendant said he noticed that Ross was carrying a Beretta and Hofmeyer had a Glock. Defendant commented that those were fucked weapons. He was sure because he was proficient with guns. He practiced and his preferred weapon was an HK or Sig. As defendant exited the car, he said he had angels tattooed on his head because he was a "dark angel."

Ross was present while defendant was photographed with his shirt off. On defendant's chest was an 18th Street tattoo with the letter "A" above it. The "A" stood for Alsace. Various photographs of defendant depicting his tattoos were placed into evidence.

## II

### *The Defense Case*

A. *The Shooting of Hector Bonilla and Jonathan Hernandez*

Michael Espindola attended the party at the Moose Lodge. He was a member of the Santa Monica gang. Espindola was a friend of victim Jonathan Hernandez. Prior to the shooting, Espindola and a male he knew as "Peanut" (later identified as original co-defendant Jose Mojarro) were talking in the parking lot. Espindola, Mojarro and Hernandez were in custody together as juveniles. Hernandez called Espindola and Mojarro asked to speak to Hernandez. After the telephone conversation, Hernandez appeared at the parking lot and the three walked into the Lodge together. There was no animosity between Hernandez and Mojarro.

As Espindola walked into the Lodge, he noticed a male wearing a red shirt and red hat standing near the entrance. He saw Hector Bonilla sitting in the hall. There appeared to be nothing wrong. He went to the bathroom. Espindola was inside the bathroom when he heard gunfire. He went into the hall and saw Hernandez on the ground. Espindola did not observe anyone fighting or firing a weapon. Mojarro and the male in the red shirt and

red hat were gone.  After Espindola left the Lodge, he was detained by police and interviewed.

Officer Gerardo Leyva interviewed Espindola on the night of the shooting. Espindola told him that he noticed Venice 13 and 18th Street gang members at the party. He got nervous when the gang members started staring at him.  Espindola saw one of his fellow gang members leave the party.  Espindola said he wished the member had stayed in case there was trouble.

The parties stipulated that on the day of the shooting, Espindola made several cell phone calls to Hector Bonilla and Jonathan Hernandez and Bonilla and Hernandez made a number of cell phone calls to Espindola.

## B.  The Shooting of Alex Haro

On January 27, 2002, the date Alex Haro was shot, Francisco Zaragoza and his family lived across the street from the scene of the party.  He was asleep when he heard gunshots.  Zaragoza looked out his front window and saw people running.  He spoke to a police officer that night, but could not recall what he said.  He was certain that he told the officer the truth.

The parties stipulated that Zaragoza was interviewed at approximately 3:10 a.m. on January 27.  He told police that he heard three shots at around 12:30 a.m.  He looked outside his home and heard someone say, "'Fuck 18th Street.'"  Zaragoza saw a white car parked in front of the scene of the shooting.  He observed people throwing rocks and bottles at the vehicle as it left the location.

In June 2010, a .45 caliber handgun was recovered in the San Fernando Valley after the arrest of two gang members.  One was from the Pacas Trece gang and the other was a member of the Knock Knock Boys.  The parties stipulated that the cartridge casings found at the scene of the Haro shooting were fired from the recovered handgun.

26

*C. The Shooting of Jesse Becerra and Raymundo Ortiz*

Claudia Chavez attended the party near 21st Street and La Brea. After she left the party, Chavez and her friend, Sergio Perez, were walking on 21st Street. She passed by the victim, Jesse Becerra, who was Perez's friend. Perez stopped to talk to Becerra and Chavez walked ahead as she spoke on her telephone. Two or three people ran by her and she heard gunshots coming from behind her. Chavez called 911.

*D. The Shooting of Mark Brown*

Officer Ryan Hicks spoke with Mark Brown as Brown was being taken to the hospital. Brown told him he did not know the shooter, but thought he would recognize him if he saw him again.

*E. Expert Testimony*

Robert Shomer is an expert with respect to the factors that affect human perception and memory and eyewitness identifications. His opinions are based on scientific research utilizing experiments and statistics.

He proffered the following to the jury: (1) unlike a camera, the human eye cannot capture everything it perceives; (2) eyewitness identifications have a relatively low level of reliability as compared to those linked by DNA or fingerprints; (3) even under the best conditions, factors such as stress and the passage of time between witnessing an event and being asked to identify someone affect the accuracy of an identification; (4) a witness's confidence level in his or her identification has little correlation to its accuracy; (5) an identification after a live lineup is more accurate than one made after a photographic showup or a viewing in court; and (6) seeing an individual in multiple showup procedures may affect the accuracy of an identification;

Dr. Ronald Markman has testified as an expert on the subject of drugs "thousands of times over the years." Methamphetamine is a stimulant

that interferes with the normal function of the brain and can cause a person to be "very, very apt to misinterpret an event." The drug can cause some to become paranoid and others to become very aggressive. Ecstasy and cocaine can produce similar effects.

Dr. Markman looked at the autopsy report prepared in the deaths of Jonathan Hernandez and Hector Bonilla. At the time of Hernandez's death, he had a significant amount of amphetamine and methamphetamine in his system. Bonilla had alcohol, cocaine and marijuana in his system.

The injuries Hernandez sustained to his face were consistent with having been struck four or five times. Dr. Markman could offer no opinion on how many times Hernandez may have been struck on other parts of his body.

## DISCUSSSION

### I

Defendant contends the trial court erred when it allowed the prosecution to join the Santa Monica Moose Lodge killings (counts one and two) with the other crimes, which took place in Los Angeles. He asserts that joinder of the unrelated crimes "that took place at disparate times and in disparate locations was so prejudicial that it deprived him of Fourteenth Amendment due process." We disagree.

Section 954 allows two or more offenses of the same class of crimes to be consolidated. Defendant suggests that the joined crimes in this case did not meet the statutory requirement that they be "'connected together in their commission'" because they were committed at different times and locations. The test, however, is that, in order to conclude that crimes are connected together, there must exist a "'common element of substantial importance in their commission.'" (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1219 (*Alcala*), quoting *People v. Scott* (1944) 24 Cal.2d 774, 778.) Here, each of the charged murders involved gang members who were gunned down in public. The similarity of the victims is akin to the scenario in *Alcala* where the homicide victims were young, Caucasian females who all suffered blunt-force facial trauma. The *Alcala* court found that the crimes were sufficiently connected. (*Ibid.*) In addition, in the

28

present case, there is little question that the intent or motivation for the shootings was to eliminate rival gang members. "[T]he intent or motivation with which different acts are committed can qualify as a 'common element of substantial importance' in their commission and establish that such crimes were 'connected together in their commission.' [Citation]." (*Ibid.*) We conclude the evidence, viewed in its entirety, sufficiently connects the murder charges and satisfies the statutory requirements for joinder. Thus, defendant had "the burden to clearly establish a potential of prejudice sufficient to warrant separate trials." (*People v. McKinnon* (2011) 52 Cal.4th 610, 630.)

"We review the trial court's decision not to sever counts for abuse of discretion based on the record when the motion was heard. [Citation.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 281.) A court abuses its discretion if its ruling falls outside the bounds of reason (*Alcala*, *supra*, 43 Cal.4th at p. 1220.) '"The factors to be considered are these: (1) the cross-admissibility of the evidence in separate trials; (2) whether some of the charges are likely to unusually inflame the jury against the defendant; (3) whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges; and (4) whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case.' [Citations.]" (*Id.* at pp. 1220–1221.) Even if the trial court's ruling was correct at the time it was made, we "still must determine whether, in the end, the joinder of counts resulted in gross unfairness depriving the defendant of due process of law." (*People v. Gonzales and Soliz* at p. 281.)

*A. Cross-Admissibility of the Evidence*

Defendant vigorously argues the evidence in the Santa Monica murders and the other murders (which we refer to collectively as the Los Angeles murders) was not cross-admissible. The Attorney General urges the evidence would have been admissible if the matters had been tried separately to establish motive and a common scheme or plan. We deem it unnecessary to decide that issue. "[E]ven if cross–admissibility did not support consolidation of the cases, the absence of cross-admissibility alone would not be

sufficient to establish prejudice where (1) the offenses were properly joinable under section 954, and (2) no other factor relevant to the assessment of prejudice demonstrates an abuse of discretion. [Citation.]" (*People v. Geier* (2007) 41 Cal.4th 555, 577, overruled on another point by *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305.)

*B. Whether Some of the Charges Were Likely to Inflame the Jury*

Defendant argues the sheer number of murder charges served to inflame the jury. In addition, he asserts the brutality demonstrated by the shooter in the Santa Monica case justified severance. Jonathan Hernandez was shot 17 times and Hector Bonilla suffered eight gunshot wounds. Defendant concludes this evidence and the multiple serious and violent charges "would prompt the jury to treat the crimes as one rather than deal with each separately." We are not persuaded.

Defendant has cited no case that suggests it is appropriate to simply count the number of properly joined charges in determining whether severance is required. The authority upon which he relies discusses the effect of adding charges in an information or indictment that are not of the same class of crime. That is not the case here. As we noted, the question, properly framed, is whether some of the joined charges likely unduly inflamed the passions of the jury and thus prejudiced the accused. Although we agree with defendant that the Santa Monica shootings were brutal, the fact of the matter is that the murder of Jesse Becerra was equally heinous. He suffered 20 gunshot wounds, including nine to the back of the head. Witnesses said the shooter continued to fire at Becerra as he lay on the pavement. Alex Haro was shot three times at point blank range, twice in the torso and once in the back of the head, because he had the audacity to defend a young man the shooter had assaulted. Simply put, the Santa Monica murders were no more violent and senseless as some of the other charged murders and did not unduly inflame the jury.

30

*C. The Relative Strength of the Cases*

Defendant claims "[a] number of the Los Angeles cases were very weak, with identifications fraught with suggestiveness and inconsistencies." Nonetheless, he points only to the Haro shooting as an example. With respect to that charge, defendant was identified by four witnesses; two said he was the shooter and two stated he entered the yard with a handgun just before the murder occurred. Julian Navarro, who selected defendant's photograph from a six-pack, was certain of his identification at the time.[5] Selina Redondo, who saw defendant with a handgun shortly before the shooting, observed him twice at her place of employment after the incident. She, too, was certain of her identification.

Defendant, while conceding the identifications in the Becerra and Kipp shootings were strong, asserts that the evidence of intent was not. He is incorrect. Becerra was shot after he was asked where he was from. Raymundo Ortiz testified that he knew there was going to be trouble because Becerra answered he was from Santa Monica and he was not in Santa Monica gang territory at the time. More to the point, Becerra was shot 20 times. Evidence of intent to kill could not have been clearer. With respect to the Kipp incident, defendant was convicted of assault with a firearm. To prove intent to commit an assault, the prosecution had to establish that "defendant did an act with a firearm that by its nature would directly and probably result in the application of force to a person." (CALCRIM No. 875.) No other evidence of intent was necessary. The testimony was more than adequate to demonstrate that defendant performed the requisite act necessary to establish defendant's intent to commit an assault with a firearm.

The joinder of the Santa Monica murders with the other offenses did not bolster an otherwise weak case.

---

[5] We recognize that Navarro, who selected defendant's photograph in February 2002, identified someone else at a lineup that took place five years later in 2007. We also note that Navarro viewed the six-pack less than a month after the shooting.

31

*D. Death Penalty Considerations*

Citing *Williams v. Superior Court* (1984) 36 Cal.3d 441, defendant claims that because the prosecution sought the death penalty, we should "give this case a higher degree of scrutiny than in the run-of-the-mill consolidation of cases and counts." However, our Supreme Court observed that, since *Williams*, "the subsequent enactment of section 790(b)—which, as noted, specifically provides for joinder of *capital* cases such as these—makes it clear that such a heightened analysis is no longer called for." (*Alcala*, *supra*, 43 Cal.4th at p. 1229, fn 19.) In addition, as the Attorney General points out, unlike the situation in *Williams*, the joinder of the counts at issue did not give rise to the special circumstances allegation of multiple murder. Defendant was eligible for the death penalty whether the Santa Monica cases were joined or tried separately. (See, e.g., §§ 190.2, subd. (a)(3) [multiple murders, based on Moose Lodge killings] & 186.22, subd. (f) [murder to further activities of street gang].) Because the joinder of the two cases did not "'convert'" the matter into a capital case, severance was not required. (*Id.* at p. 1229)

After examining the four factors, we conclude that defendant failed to carry his burden of clearly establishing "a potential for prejudice sufficient to warrant separate trials." (*People v. McKinnon*, *supra*, 52 Cal.4th at p. 630.) The trial court's decision to join the charges did not constitute an abuse of discretion.

*E. Defendant's Right to Due Process*

Defendant contends the evidence presented with respect to the Santa Monica murders made it unlikely that the jury could give due consideration to each of the counts arising out of the Los Angeles incidents. Without analysis, he argues that "[i]t is highly likely [defendant] would have obtained a better result on some of the counts had the two cases been tried separately." We reject this speculative claim.

Finally, seizing on one statement he made while testifying during the retrial of the penalty phase, defendant urges he was denied the opportunity to testify during the guilt phase. Defendant said that he was mad at his attorneys because they "should've let [him]

32

testify during my guilty [*sic*] phase." On appeal, he suggests he would have testified separately in the Santa Monica case if it had not been joined with the Los Angeles offenses. That is not a fair reading of his statement at trial, during which he gave no hint that he desired to limit his testimony to only the Santa Monica charges.

The joinder of counts did not result in an unfair trial that deprived defendant of due process of law.


II

Defendant alleges the photo identification of Cesar Banuelos was the product of a suggestive photo array prepared by Santa Monica Police detectives and argues its admission violated his right to due process.[6] He notes witnesses said that one of the suspects was wearing a bright red shirt. He complains that after Banuelos identified others who were at the party, detectives showed him a six-pack with defendant's picture and told him to concentrate on the suspect who had been described as wearing a bright red shirt. Only then, defendant argues, did Banuelos select defendant's picture.

In determining whether the admission of identification evidence violated defendant's right to due process, we consider whether the procedure was unduly suggestive and unnecessary, and, if so, whether the identification itself was nevertheless reliable under the totality of the circumstances. (*People v. Thomas* (2012) 54 Cal.4th 908, 930.) We need not determine whether the identification was reliable unless we find that the procedure utilized was unduly suggestive. (*Id.* at pp. 930–931.)

Defendant "does not persuade us that he met his burden of showing an unduly suggestive identification procedure." (*People v. Ochoa* (1998) 19 Cal.4th 353, 413.) Detective told Banuelos to concentrate on the individual who was wearing the bright red shirt when they showed him the photographic lineup. They did not suggest anyone in the

---

[6] The Attorney General argues defendant forfeited this contention by failing to secure a ruling on his motion to suppress Banuelo's identification in the trial court. In order to forestall a claim of ineffective assistance of counsel, we address defendant's claim. (See *People v. Mitcham* (1992) 1 Cal.4th 1027, 1044, fn. 5.)

array was that individual. More importantly, they did nothing to hint to Banuelos that defendant's photograph was the one he should select. Certainly if an officer told a witness to concentrate on the face of the person who robbed him and nothing more, there would be nothing unduly suggestive about the procedure. So it is here.

Even if we were to determine that the procedure utilized was unduly suggestive, Banuelos's identification of defendant was reliable. Banuelos had prior contacts with defendant, having seen him in the neighborhood. We observe defendant does not address the issue of reliability.

The identification process did not deprive defendant of due process.

III

Four witnesses, Carlos Diaz, Salina Redondo, Erica Diaz and Sheba Robinson did not appear at two court-ordered lineups. Defense counsel moved to exclude Redondo's in-court identification due to her failure to attend the lineup. The trial court declined to do so, noting there was no authority to support the request. Later, when the parties were discussing exhibits, the defense moved to exclude Sheba Robinson's photographic identification on the same ground. Again, the court denied the request, deciding that giving what it called the "Fernandez instruction" (*People v. Fernandez* (1990) 219 Cal.App.3d 1379) would cure the problem.

The trial court modified CALCRIM No. 315 that sets forth the factors the jury should consider in evaluating eyewitness identifications. The modification read: "Some witnesses that testified in court failed to attend the physical lineup, despite being requested to attend. You should view their testimony, as to eyewitness identification, with caution as it may be less reliable than if the witness had attended the physical lineup."

Defendant contends "the trial court's mildest of cautionary instructions was no remedy at all. It rewarded the People for not ensuring attendance of witnesses at the live lineups because the court imposed no sanction whatsoever for the denial of legitimate

34

discovery." He urges the court's failure to exclude the identifications of the four witnesses in question violated his right to due process.[7] We disagree.

With respect to the instruction given by the trial court, the court had discretion to fashion a remedy short of excluding the identifications. Similar instructions were approved in *People v. Virgil* (2011) 51 Cal.4th 1210, 1255–1257 (jury told it could consider "'[t]he failure of a witness to attend a live line-up' in assessing the accuracy of that witness's identification") and *People v. Fernandez*, *supra*, 219 Cal.App.3d at pages 1384–1385 (jury instructed it should view testimony of witnesses who failed to attend lineup with caution, as it may be less reliable). As in those cases, the trial court appropriately instructed the jury here.

As to defendant's complaint regarding the admission of the witnesses' identifications, "the Constitution does not require exclusion of eyewitness testimony as a sanction for a witness's failure to attend a lineup." (*People v. Virgil*, *supra*, 51 Cal.4th at p. 1256.) Defendant attempts to avoid the holding of *Virgil* by claiming the witness's identifications were unreliable. First, defendant cites no case suggesting that the rule stated in *Virgil* applies only to otherwise reliable eyewitness testimony. Second, the jury assessed the strength of the witnesses' identifications. Any issue defendant has with its determination is more appropriately an attack on the sufficiency of the evidence, which we address below.

In his reply brief, defendant also asserts *Virgil* should not apply because the identification process of witness Banuelos was unduly suggestive and Sheba Robinson was not asked to attend a lineup. Banuelos was not one of the witnesses who failed to attend a lineup and, as we have discussed, the process utilized during his viewing of the photographic lineup was not unduly suggestive. As to Robinson, there would be more reason to scrutinize the identification of a witness who willfully failed to attend a lineup

---

[7] The Attorney General argues the contention was forfeited because defendant did not object on due process grounds in the trial court. For the same reason set forth above, we address defendant's claim. (See footnote 6, *ante*.)

35

(as was the case with Carlos Diaz, Redondo and Erica Diaz) than one of a witness who was never asked to attend.

The trial court properly exercised its discretion by reading the tailored instruction regarding the witnesses who did not appear at the physical lineup.


IV

Prior to trial, the parties learned that cartridge casings recovered from the scene of the shootings of Donell Kipp and Mark Brown were destroyed, although photographs of the casings remained. The defense motion to exclude testimony relating to those casings was denied.

As we have discussed, the prosecution's ballistics expert, Starr Sachs, was able to examine the casings from the Kipp and Brown shootings prior to their destruction. After examining the casings from the Walton homicide, Sachs determined that the casings from the Walton and Brown shootings were fired from the same gun. Sachs also had access to cartridge casings from the Reddix murder. She concluded that the casings collected from the scenes of the Kipp, Walton and Reddix shootings were fired by the same weapon.

In the trial court, the defense objected to the evidence relating to the Reddix incident. It was concerned that the jury would reason that Reddix was the victim of a homicide and conclude defendant was responsible.[8] The prosecution responded that the details of the Reddix shooting could be kept from the jury. The defense objection was overruled.

During trial, the prosecution was allowed to elicit evidence explaining why the Kipp and Brown cartridge casings were destroyed. Officers testified that because they were non-homicide cases and no special holds were placed on the evidence, the casings were destroyed. The defense again objected to the Reddix evidence, noting that after the

---

[8] The Attorney General argues defendant forfeited the contention by failing to object pursuant to Evidence Code section 352. We disagree. Defense counsel specifically stated his concern was that the admission of the evidence would unduly prejudice his client.

jury learned that casings were subject to destruction because they were collected in a non-homicide case, it would necessarily conclude that Reddix was a murder case. The trial court overruled the objection, stating that whether the jury would consider the nature of the Reddix case in this regard was speculation.

Defendant contends that admission of the Reddix evidence "was bound to lead to jury speculation and generate irreparable prejudice." As a result, defendant urges, he was denied a fair trial. The crux of defendant's argument is that the jury must have concluded the Reddix case was a homicide and that he was responsible. These assumptions are unwarranted.

As to whether the jury would readily ascertain the Reddix case was a homicide, defendant concedes it was not told that was the case. Instead, he asserts, the testimony concerning how the ballistics evidence was retained would inexorably lead it to reach that conclusion. The jury was informed that in non-homicide cases, such as Kipp and Brown, evidence is held for six months and is destroyed unless a request is made to extend the hold for another six months. In homicide cases, items are held for one year and requests for extensions are routinely made. Thus, defendant suggests, because the cartridge casings in the Kipp and Brown shootings were destroyed and those connected to the Reddix case were not, the jury must have concluded that the Reddix case was a homicide. However, the jury also heard testimony that sometimes evidence is destroyed because the investigating officers are transferred and the new handling detectives are not aware that a new hold request is necessary. In nonhomicide cases, the evidence may be retained if police so request. The jury easily could have thought the cartridge casings were destroyed for either of these reasons. Of course, this assumes the jury would have been concerned with the details of the Reddix homicide. Defendant was not charged in connection with that shooting. Instead, the jury learned the gun used in the Reddix incident, not the perpetrator of that incident, was relevant. This was so because the shell casings from the Kipp, Brown and Walton shootings were fired from the same weapon.

It is an even greater stretch to accept that the jury must have determined defendant was guilty of killing Reddix. Defendant argues any juror with common sense would have

37

so concluded. To the contrary, because defendant was not charged with killing Reddix, a reasonable juror would be more likely to conclude that defendant was not involved. After all, he was charged with murdering five other individuals, but not Reddix. In addition, the jury received evidence that the weapon used to kill Alex Haro was found in the San Fernando Valley eight years after his murder in the possession of gang members who had no connection to this case or to defendant. Thus, the jurors learned that weapons did not necessarily stay in the possession of the same gang, much less the same individual.

The jury had no reason to ignore the court's instruction that it was to decide the case based only the evidence presented during the trial. Defendant's claim the jury was compelled to decide issues unconnected to the case and did so to his detriment is without merit.


V

Defendant alleges the trial court deprived him of a fair trial by unduly restricting the testimony of Robert Shomer, his expert on eyewitness identification. He asserts Shomer was barred from answering hypothetical questions and offering his opinions, which were based on professional literature in the field. As a result, defendant argues, he was prevented from presenting a complete defense in a case that was so dependent on eyewitness identification. His claim is not supported by the record.

The court heard the prosecutor's motion to limit the scope of Shomer's testimony. At no time during that hearing did the court issue a blanket order barring any testimony, with the exception of Shomer's opinion regarding the accuracy of the witnesses' identifications. Defendant does not challenge that ruling. The court noted that it had heard Shomer testify a number of times. The court reiterated twice that it would rule on objections "on a question-by-question basis."

Contrary to defendant's complaint, Shomer was allowed to explain that his knowledge in the field was based on experimental studies and he informed the jury of the results of those studies. Significantly, defendant does not cite any question that his expert

38

was not allowed to answer. He broadly urges he could not with specificity cite to the record what evidence was barred "because it was excluded before the witness testified." Not so. Defendant's expert was allowed to present his opinion virtually without restriction. The court sustained two of the prosecutor's objections. On both occasions, defense counsel was able to rephrase his question and Shomer was allowed to answer. Defendant's right to present a defense was not infringed.

VI

As noted, there were two penalty trials. On November 1, 2011, after the parties completed argument in the second penalty trial, the prosecutor advised the court that his office had received a letter from an individual identifying himself as Jose Mojarro. Jose Mojarro was a co-defendant in the Moose Lodge shootings and was convicted in a separate trial. Defense counsel acknowledged receiving the letter, which was dated October 12, 2011. He read the contents of the letter into the record as follows: "I killed Richard Haro on West View Boulevard. I seek no sympathy or any type of sympathetic treatment. I shot him three times, twice in the chest, once in the head. Sincerely, Jose Mojarro." The court recessed for the morning. That afternoon, the jury was instructed and began deliberations.

On the morning of November 3, 2011, the parties convened in court to discuss a question posed by the jury. After resolving that matter, the following colloquy followed:

Defense Counsel: "I thought about the note from Mojarro, the note that was dated October 12 [and] sent to the D.A.'s office, and we read it into the record.

The Court: "Yes?"

Defense Counsel: "You know, I have no idea of the substance of the materiality of his claim that he was the one that killed Haro.

The Court: "Yes?

Defense Counsel: "The only way I can think of preserving the substantive - - if there is any substantive value and the delay, apparent delay in turning over the note, is to bring a motion for a mistrial at this moment."

39

The mistrial motion was denied.

On appeal, defendant attempts to characterize counsel's motion as a request for a new trial. He then faults the court for not considering the factors set out in section 1181, subdivision 8, which apply where a motion for new trial is brought on the ground of newly discovered evidence. The Attorney General argues defendant forfeited the claim by failing to move for a new trial below. She is correct.

At no time during the discussion of the letter purportedly authored by Mojarro did defense counsel utter the words "new trial." Belatedly, defendant argues a jury would have had serious reservations about finding him guilty of Haro's murder had it known of Mojarro's letter.

The very points defendant now raises make clear that trial counsel had no intention of moving for a new trial on the guilt phase that had been completed almost a year before. If he had, he would have made the same arguments defendant presses now. Trial counsel did not mention the guilt phase of the trial or ask the court to consider the effect of Mojarro's admission on the jury's determination that defendant murdered Haro. Defendant urges counsel's words are not dispositive. Instead, defendant says, "the substance of his argument controls." We are not persuaded.

The fact is trial counsel did not move for a new trial. In the trial court a defendant must specify the grounds relied upon in making a motion for new trial and a failure to do so forfeits the issue for appeal. (*People v. Gonzales and Soliz, supra,* 52 Cal.4th at p. 332.) Trial counsel did not cite section 1181 or assert any grounds suggesting he was seeking a new adjudication of defendant's guilt with respect to Haro's murder. The trial court could not err by failing to grant a new trial motion that was never brought.


VII

Defendant attacks the sufficiency of the evidence underlying several of the convictions. As to the Moose Lodge homicides (Bonilla and Hernandez), and the Haro and Brown shootings, he alleges there is a lack of evidence demonstrating that he was the shooter. Alternatively, he argues the convictions for first degree murder in the Moose

40

Lodge and Haro incidents must be reduced to either second degree murder or manslaughter.

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence – that is, evidence that is reasonable, credible, and of solid value – from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 701.) "In so doing a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] 'This standard applies whether direct or circumstantial evidence is involved.' [Citation.]" (*Ibid.*) With this standard in mind, we examine the evidence presented.

With regard to the Moose Lodge shootings, several witnesses identified defendant as one of the shooters. Ramon Mendoza saw the fight break out between the victims and other males. He identified defendant as one of the shooters after viewing a photographic lineup and at trial. Crispin Yanez, who knew defendant, told detectives that defendant was one of the shooters, pointing out that he continued to fire his weapon at one of the prostrate victims. At trial, Yanez claimed he lied to police. The jury apparently did not believe Yanez's attempt to distance himself from his earlier identification. Imelda Martinez told another witness that she believed defendant, with whom she was familiar, was one of the shooters. In addition, a number of other witnesses said the shooter was at the party wearing a bright red shirt and baseball hat, which is what defendant wore. Several witnesses also testified that they did not recall any other guests dressed in a similar fashion.

Defendant contends the witnesses to the Moose Lodge shootings could not have seen the killers because there were so many people in a dark room, "lit only by dim lamps on two or three tables." He sets forth what he perceives to be shortcomings in each witness's identification. He presented these arguments to the jury, and they were rejected. We do not reweigh the evidence. "'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment for it is the

41

exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' [Citation.]" (*People v. Lee* (2011) 51 Cal.4th 620, 632.)

Turning to the murder of Alex Haro, Julian Navarro and Erica Diaz identified defendant as the shooter after viewing photographic lineups. In addition, other witnesses said defendant was armed with a gun as he went into the backyard, the location where the shooting occurred.

Again, defendant argues, as he did to the jury, that inconsistencies in the witnesses' testimony rendered it unreliable. However, unless defendant demonstrates that either Navarro's or Diaz's testimony was either physically impossible or inherently improbable, the identification of either, standing alone, is sufficient to support defendant's conviction. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Defendant has not met that burden.

Alternatively, defendant asserts that even if the evidence is sufficient to identify him as the shooter, we should reduce his convictions in the Moose Lodge and Haro cases to either second degree murder or manslaughter. However, he does not explain why the evidence fails to support the jury's finding that he committed first degree murder. "As this contention is perfunctorily asserted without any analysis or argument in support, we reject it as not properly raised." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1107, fn. 37.)

We address the evidence in the Walton murder. Kevin Walton was shot at a location that was approximately a quarter to a half mile from where Mark Brown was shot by defendant. This was a distance that could be traveled by car in about a minute. Walton's shooting was reported to 911 roughly two minutes after Sheba Robinson called 911 and told the operator that Brown had been wounded. Brown identified defendant as the person who shot him and the ballistics expert stated that the same gun was used to shoot Brown and Walton.

Defendant attacks the testimony of Brown, who provides the link between the Brown and Walton shootings. Again, it was within the jury's purview to accept Brown's

42

testimony and we may not disturb its credibility finding. Relying on the jury's conclusion that he did not personally fire the weapon during the Walton murder, defendant urges we must accept he was not the shooter. Even so, as the prosecutor pointed out, at best this reduced defendant's liability to that of an aider and abettor to a first degree murder. Defendant does not explain why the jury finding on the firearm allegation renders the underlying conviction for murder unsupported. Given the relationship between the time and location of the two shootings, the jury could reasonably conclude that defendant was present at both shootings, personally firing at Brown and assisting in the murder of Walton.

### VIII

Asserting this was a close case, defendant contends serious errors of Constitutional dimension caused irreparable prejudice. Having rejected his claims of error, we conclude he did not suffer cumulative prejudice. (*People v. Tully* (2012) 54 Cal.4th 952, 1020.)

### IX

Defendant filed a *Pitchess* motion seeking citizen complaints lodged against Santa Monica Police Detectives Richard Lewis and John Henry for threatening or harassing witnesses or causing witnesses to make false statements or identifications. In his declaration in support of the motion, defense counsel alleged the detectives "harassed, badgered and threatened witnesses Ruben Martinez and Imelda Martinez during the course of this investigation in order to cause them to implicate [defendant] in the shooting at the Moose Lodge." The detectives also were accused of threatening Crispin Yanez into stating that defendant was involved in the shooting and using improper identification procedures to get Ramon Mendoza to identify defendant's photograph from a six-pack.

As to the allegations of misconduct relating to Mendoza, Ruben Martinez and Imelda Martinez, the trial court concluded "there is simply a failure of a legitimate or plausible or possible scenario other than pure unabridged speculation to involve those officers and for the court to review their personnel records." Because defendant's claim

with respect to Yanez was based on Yanez's preliminary hearing testimony, the court deferred ruling on the motion until it read the transcript of the hearing.

Defendant filed an amended *Pitchess* motion focusing on the interview between the detectives and Yanez. Counsel's declaration outlined Yanez's preliminary hearing testimony at which he claimed he lied to detectives about having seen defendant shooting at the victims in the Moose Lodge. Counsel contended the detectives conspired with officers from the Los Angeles Police Department to obtain false statements from Yanez.

The trial court denied the motion. After noting that it had read Yanez's preliminary hearing testimony, it stated "[e]verything that the witness complained of is his own personal feelings."

Defendant contends the court erred by failing to conduct an in camera hearing.[9] He argues Yanez testified that he lied to the detectives and felt compelled to identify defendant because it was what the detectives wanted to hear. Defendant argues this testimony was enough to support the conclusion that the detectives conspired with other officers to force Yanez to falsely identify defendant as the shooter. His claim is unavailing.

Defendant correctly points out that to show cause for an in camera review of an officer's personnel records, he "need demonstrate only 'a logical link between the defense proposed and the pending charge' and describe with some specificity 'how the discovery being sought would support such a defense or how it would impeach the officer's version of events.' [Citation.]" (*People v. Gaines* (2009) 46 Cal.4th 172, 182.) We review a trial court's ruling on a *Pitchess* motion under the deferential abuse of discretion standard. (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039.)

Initially, we observe that defendant asserts the trial court denied his motion only after improperly determining that Yanez was not a credible witness. He is mistaken. In

_____

[9] We are aware that because the court deferred ruling on the motion until it had the opportunity to read Yanez's preliminary hearing testimony, it decided to review the personnel files of the officers involved for the convenience of the custodian of records. Given our conclusion on this issue, we deem it unnecessary to examine the transcript of that inquiry.

fact, *after* the court ruled on the motion, it commented that Yanez was not a credible witness and specifically stated that it "didn't consider that."

On the merits, defendant theorizes that the factual scenario set forth in his motion "was plausible because it is more likely that Yanez fingered [him] for the Moose Lodge shooting because he was threatened with the death penalty in a murder case in which the detectives *knew* Yanez was not involved." Nothing in Yanez's preliminary hearing testimony supports that conclusion.

At no time did Yanez say or suggest that the detectives engaged in misconduct. He did not accuse them of threatening him in any fashion. He assumed that they wanted him to implicate defendant in the shooting at the Moose Lodge, but he did not point to any instance when the detectives suggested it would work to his advantage if he identified defendant. As to defendant's assertion that Yanez was threatened with the death penalty in another case, Yanez was questioned by *Los Angeles Police Department* detectives in connection with that incident, not by the Santa Monica detectives who were the subject of the *Pitchess* motion. Defendant's attempt on appeal to weave a conspiracy to frame him between the Los Angeles and Santa Monica detectives fails. Counsel's declaration in support of the motion did not attempt to establish a factual scenario, plausible or otherwise, suggesting such an arrangement.

The trial court's denial of defendant's *Pitchess* motion did not constitute an abuse of discretion.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EPSTEIN, P. J.

We concur:


WILLHITE, J.                          MANELLA, J.

45