[No. B016657. Second Dist., Div. Two. May 1, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
LEE EDWARD HARRIS, Defendant and Appellant.

COUNSEL

Joseph F. Walsh, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Robert F. Katz and John R. Gorey, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

GATES, J.—Lee Edward Harris appeals from the judgment sentencing him to life imprisonment without the possibility of parole following his conviction by jury of burglary (Pen. Code, § 459), two counts of robbery (Pen. Code, § 211) and two counts of murder (Pen. Code, § 187) with special circumstances (former Pen. Code, § 190.2, subds. (c)(3) and (c)(5)). He contends:

"I.   The appellant was denied his constitutional right to testify in his own behalf and the trial judge had no authority under Penal Code, section 1018

to grant defense counsel's motion to prohibit the appellant from testifying. II. Appellant's constitutional right to a jury drawn from a fair cross-section of the community was violated requiring reversal of his convictions. III. The court erroneously sentenced the appellant to consecutive life sentences."

Appellant's earlier conviction and death sentence were reversed by our Supreme Court in *People* v. *Harris* (1984) 36 Cal.3d 36 [201 Cal.Rptr. 782, 679 P.2d 433]. The evidence upon retrial was again sufficient to establish that appellant was involved in a 1977 interstate robbery-murder spree in association with Charles Edward Moore and Terry Avery.[1]

Prior to this proceeding, two alienists had examined appellant and found him competent to stand trial. (Pen. Code, § 1368.) At the close of the People's portion of the guilt phase, out of the presence of the jury, he expressed his desire to testify in his own behalf. Instructed to reflect on this decision overnight, appellant nonetheless remained steadfast.

When his counsel continued to object, however, the court excused the deputy district attorney, had appellant take the stand under oath, and then inquired, "What is it that you would like to testify about?" In the transcript before us, appellant is reported to have responded: "That I am guilty of the crimes."

Most oddly, if our transcription is accurate, neither court nor counsel manifested any surprise or concern regarding this reply. Rather, the court merely advised, "All right. . . . [Y]ou can say whatever you want to say now. Then I'll make a determination after you finish as to whether or not you should be permitted to testify in the presence of the jury." There then followed an extended and rambling narrative statement in which, inter alia, appellant made these declarations:

"I, Lee Edward Harris of Monroe, Louisiana, did not commit any of the crimes that I am accused of, although I was in the vicinity.

". . . . . . . . . . . . . . . . . . . .

"No, I didn't go over to the apartment, the complex of Mr. and Mrs. Walter Watson or the apartment complex that Mr. and Mrs. Robert Crumb managed. [At this point appellant gave a lengthy and minutely detailed account of his activities on the night of the instant robbery-murders, which, if true, would have constituted a complete alibi defense.]

---

[1]In May of 1979 appellant had pled guilty to kidnapping, robbery and murder in Kansas and been sentenced to life imprisonment there.

"  . . . . . . . . . . . . . . . . . . . .

"... Your Honor, if I'm guilty of anything at all, it is of two other robberies not related to the crime of burglary and double robbery and a double homicide perpetuated [*sic*] allegedly against Mr. and Mrs. Robert and Hattie [*sic*] Crumb.

"If you were to ask me if the statute of limitations has ran out for those other two robberies, I would be inclined to say yes."

Being undirected by questioning, appellant also remarked upon his belief that he was an "indirect descendant" of former slaves, his limited educational and social opportunities, as well as certain of his religious views. His unguided monologue ended in the following manner:

"THE COURT: All right.

"Now as I understand it, what you are saying, you did not commit the crimes.

"THE DEFENDANT: I did not commit.

"THE COURT: That you were in the vicinity—

"THE DEFENDANT: Was in the vicinity.

"THE COURT: But not in the apartment—

"THE DEFENDANT: But not in the apartment complex.

"  . . . . . . . . . . . . . . . . . . . .

"THE COURT: So in essence, what your defense is is that you weren't in the apartment and you were in the area.

"THE DEFENDANT: I was in the area, yes.

"THE COURT: But that's the extent of your involvement.

"THE DEFENDANT: That's the extent."

At this juncture appellant's attorney called the court's attention to Penal Code section 1018, which provides, in pertinent part: "No plea of guilty of

a felony for which the maximum punishment is death, or life imprisonment without the possibility of parole, shall be received from a defendant who does not appear with counsel, nor shall any such plea be received without the consent of the defendant's counsel." He then asked the court to deny appellant the right to present his alibi defense to the jury, stating:

"The court is aware through my voir dire of the jurors that based upon my conferences with Mr. Harris, it was my belief that Mr. Harris would not testify in any phase of this proceeding.

"The case has been defended on that basis; and as I represented earlier, I am prepared to rest on the state of the evidence.

". . . I see no basis on which to change *my* [sic] defense or exclude Mr. Harris' comments from section 1018.

". . . . . . . . . . . . . . . . . . . . . . .

"He has had an opportunity to explain to the court and put on record his comments regarding all aspects of this case, and I think that should be considered to be sufficient, *that the thrust of his comments would only harm the defense that has alreay been prepared.*" (Italics added.)

The court agreed stating: "The court will conclude that counsel's judgment, after having read Penal Code section 1018, must prevail, that counsel's views . . . are determinative, and the court also finds that Mr. Harris' statements do not suggest a defense in the interest of justice cited by Penal Code section 1018."

Appellant continued to express his dissatisfaction with his counsel who, as indicated, wished to, and did, rest without presenting any evidence. In fact, when the court in conclusion again stated, "[your attorney] is citing Penal Code 1018, and it is his judgment that must prevail here," appellant asserted, "I want [my attorney] off my case."[2]

The trial court's reliance on Penal Code section 1018 was simply, and most regrettably, erroneous. Appellant was not attempting to enter *a plea,* nor to take any other form of action that would have eliminated the People's need to prove their cause; he merely sought to assert his inviolable right to be heard in his own behalf.

---

[2]Regarding the potential signficance of this latter request, which appellant repeatedly made and the court repeatedly rejected throughout the trial, see *People* v. *Blye* (1965) 233 Cal.App.2d 143, 149 [43 Cal.Rptr. 231].

■ As stressed in *People* v. *Chadd* (1981) 28 Cal.3d 739, 748 [170 Cal.Rptr. 798, 621 P.2d 837], a plea of guilty, inter alia, "serves as a stipulation that the People need introduce no proof whatever to support the accusation: the plea ipso facto supplies both evidence and verdict. [Citation.] 'A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment.' [Citation.] . . ." (See also *People* v. *Massie* (1985) 40 Cal.3d 620, 623 et seq [221 Cal.Rptr. 140, 709 P.2d 1309].)

Once the People have made the requisite showing, however, a defendant's opportunity to be heard by those who would judge him is an entirely different matter.

Initially we entertain the gravest doubts regarding the propriety of any court requiring a defendant to announce his anticipated testimony simply to justify his right to take the stand. ■ That is, assuming sanity (see *People* v. *Robles* (1970) 2 Cal.3d 205, 215, fn. 1 [85 Cal.Rptr. 166, 466 P.2d 710]), once an accused has been made aware of his legal rights he, not his attorney, and certainly not the court, must decide whether his oral declarations to the jury will prove beneficial to him, even when they constitute a complete confession.

While the truth may not immediately set free those who have violated the laws by which society governs itself, leniency often is extended to the truly repentant. Further, even a demonstration of limited intellectual capacity or emotional stability may be more productive of compassion than an enigmatic silence that might well be mistaken for cunning or obdurate malevolence.

Under one view of our adversary system an attorney owes no duty to aid in the development of the truth, and may, within the restraints imposed by the canons of ethics, even seek to block its discovery at every turn. Even so, no counsel to date has been granted the power to preclude his client from such a revealing enterprise. In fact, we believe it is possible, without unconstitutionally intermingling the spiritual and the secular, to acknowledge the cathartic value of even a full confession when freely and voluntarily given.[3]

---

[3]"As many commentators and courts have recognized, there is a 'compulsion to confess' to crime. Wigmore states the point colorfully: 'The nervous pressure of guilt is enormous; the load of the deed done is heavy; the fear of detection fills the consciousness; and when detection comes, the pressure is relieved; and the deep sense of relief makes confession a satisfaction. At that moment, he will tell all, and tell it truly. To forbid soliciting him, to seek to prevent this relief, is to fly in the face of human nature.' [Citations.] A psychiatrist explains the phenomenon of confessions in terms of subconscious but overpowering guilt feelings and desire for punishment. 'There is . . . an impulse growing more and more intense suddenly to

Our observations in this regard should not be construed as disparaging in the slightest either the dedication or the ability of appellant's trial counsel. On the contrary, it appears entirely possible that a verdict of death would again have been returned had the triers of fact been permitted to hear appellant testify. They might have concluded that his participation in the crimes had been established so irrefutably his contrary averments were necessarily perjurious. Moreover, his expressions of hostility toward life in general and, more particularly, toward the judge, both counsel and even the jurors, might have had an adverse impact.

Nevertheless, much as we may agree, from a strategic point of view, with the astuteness of defense counsel's tactics, our concurrence, like that of the trial court, will not serve to justify the overriding of appellant's personal privilege. One facing death or life imprisonment is entitled to make such response to the charges leveled against him as he alone deems best, even if his legal advisor finds preferable another, and less candid, tack. In the words of our Supreme Court: "In *Robles,* [*supra,*] a capital case, the defendant had insisted, over his attorneys' objection, on testifying in his own behalf; on appeal, appellate counsel claimed that the trial court had erred in permitting such testimony on the ground that the decision whether to call defendant as a witness was a tactical decision within the province of trial counsel's authority. In rejecting that contention, we explained: 'Although ... an attorney representing a criminal defendant has the power to control the court proceedings [citations], that power may not be exercised to deprive a defendant of certain fundamental rights [citations]. [¶] We are satisfied that the right to testify in one's own behalf is of such fundamental importance that a defendant who timely demands to take the stand contrary to the advice given by his counsel has the right to give an exposition of his defense before a jury. [Citation.] The defendant's insistence upon testifying may in the final analysis be harmful to his case, but the right is of such fundamental importance that every defendant should have it in a criminal case. ▮ Although normally the decision whether a defendant should testify is within the competence of the trial attorney [citation], where, as here, a defendant insists that he wants to testify, he cannot be deprived of that opportunity.' (2 Cal.3d at pp. 214-215.)" (*People* v. *Frierson* (1985) 39 Cal.3d 803, 813 [218 Cal.Rptr. 73, 705 P.2d 396].)

---

cry out his secret in the street before all people, or in milder cases, to confide it at least to one person, to free himself from the terrible burden. The work of confession is thus that emotional process in which the social and psychological significance of the crime becomes preconscious and in which all powers that resist the compulsion to confess are conquered.' [Citation.] [¶] So long as the methods used comply with due process standards, it is in the public interest ... to encourage confessions and admissions .... [Citations.]" (Fns. omitted.) (*People* v. *Garner* (1961) 57 Cal.2d 135, 163-164 [18 Cal.Rptr. 40, 367 P.2d 680] (conc. opn. of Traynor, J.).)

Inasmuch as our appellant was not accorded his constitutional right to testify (*Faretta* v. *California* (1975) 422 U.S. 806, 834, fn. 45 [45 L.Ed.2d 562, 581, 95 S.Ct. 2525]), we have no option but to reverse. Neither the good faith of the trial court, the well-advised tactical considerations of the defense counsel, nor even the seemingly overwhelming evidence of guilt will enable us to sustain a conviction founded upon such a deprivation.

In light of the foregoing, we need not reach appellant's other assignments of error.

The judgment is reversed.

Roth, P. J., and Compton, J., concurred.