[No. B036271. Second Dist., Div. Five. Apr. 30, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
RAUL BEN FERNANDEZ, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III, IV, V, VI, VII, VIII, IX, X and XI.

**COUNSEL**

Richard Power, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, John R. Gorey and Susan D. Martynec, Deputy Atorneys General, for Plaintiff and Respondent.

**OPINION**

**LUCAS, P. J.**—Raul Ben Fernandez appeals from judgment entered after a jury found him guilty of three counts of second degree robbery (Pen. Code, § 211), one count of assault with a deadly weapon (Pen. Code, § 245, subd. (a) (1)), and one count of grand theft auto (Pen. Code, § 487, subd. 3). We modify the judgment and affirm as modified.

## FACTS

On October 7, 1987, Auxiliadora Martinez returned to her car after cashing checks at the bank. As she entered the car, she was approached by Ronald Ziegler, who pointed a long-barreled gun at her stomach and said, "Get out of the car." Mrs. Martinez ran inside the bank, leaving her purse on the driver's seat of the car and the keys in the car ignition.

While this was occurring, a Hispanic man opened the passenger side of the car where Mrs. Martinez's nephew, Julio, was seated. He held a knife about 10 inches from Julio's stomach. As Julio started to get out of the car, the man pulled him out and the two men drove away. The car was recovered a short time later, and Mrs. Martinez got her purse back the following day without the money.

About a week after the robbery, Julio selected a photo of appellant Fernandez from a photo lineup as the man who had the knife. At a live lineup conducted a month after the robbery, Julio was unable to identify either robber.

At about 9 p.m. on October 11, 1987, Kimberly Schull parked her 1974 brown Camaro in a parking lot near her house. The keys were accidentally left in the ignition. When she returned to that location at 3 p.m. the next day, the car was gone. She next saw the car in a wrecking yard; the whole front of the car was smashed. Ammunition found in the car had not been placed there by Ms. Schull.

The brown Camaro was involved in a collision with a van in San Fernando at about 2 p.m. on October 12, 1987. Cheri Petree saw the collision. She saw a White man get out of the passenger side of the Camaro; his forehead was bleeding. She then saw a man she described as Hispanic get out of the driver's side of the Camaro. The passenger leaned into the car, pulled out something that looked like a shotgun and stuffed it down his pants. The driver took a hat from the front seat of the car and put it on. The two men then walked away down Jackman Street. Ms. Petree talked with police officers who came to investigate the collision. Although she was notified to attend a lineup in December 1987, she did not do so because she was expecting a baby any day and the doctor advised her not to attend.

Shortly after the collision on the afternoon of October 12, 1987, Guadelupe Penaloza was putting his lunch into the backseat of his car on Jackman Street. When he stood up to get into his car, he saw two men, one on either side of him. They told Penaloza that they wanted a ride. One of the men had blood on his face and a weapon in his belt area. The other man, who

appeared to be Mexican, had a knife in his hand. Penaloza told them he couldn't give them a ride because he had to go to work. The men told him to sit down in the back of the car and they also asked him for money. Penaloza felt afraid and nervous, and crossed the street, leaving his keys on the car. The men drove away in the car; it was later recovered at a towing yard. Penaloza attended a lineup the following month. In one lineup he identified Ziegler as the man who had the weapon in his waistband. In the lineup which included Fernandez, although Penaloza was unsure, he selected someone else as the other person involved in the October 12 incident.

At about 5 p.m. on October 12, Tulsidas Bhatia was working at Roads Video Store in Sylmar when Ziegler entered, looked around and left. Ten or fifteen minutes later, Ziegler returned, pointed a gun at Bhatia, and said, "Give me the money." Bhatia opened the cash register drawer; Ziegler came across the counter, took the money, and left the store.

Between 11 and 11:30 a.m. on October 13, 1987, Abdul Mohfouz was working behind the counter at Universal Video on Laurel Canyon Boulevard. Fernandez entered the store and walked around, then Ziegler entered. Ziegler walked up to the counter and Fernandez stood about two and one-half feet in front of Mohfouz. Fernandez pointed the gun at Mohfouz and said, "Give me the money," Ziegler walked behind the counter and said, "Give me your wallet." Mohfouz gave Fernandez the store's money and gave Ziegler his wallet. Ziegler hit Mohfouz in the back of the neck with something hard. Ziegler and Fernandez then left the store. At a lineup in November 1987, Mohfouz identified someone other than Ziegler as most resembling the person who took his wallet.

Carl Campos was in the video store during the robbery and saw the two men at the counter, one white and one Hispanic. He saw them leave in a white Ford, with the Hispanic man driving. He later saw them handcuffed on Hubbard Street. At the lineup in November, Campos identified someone other than Fernandez as the Hispanic robber.

Corina Gomez was in the parking lot at Universal Video on the morning of the robbery. She saw Ziegler standing by a white car, looking around everywhere. He had a bandanna on his head covering his forehead, looking as if it might be a bandage. She saw Ziegler enter the video store. A few minutes later, he came out walking quickly with Fernandez. Each man had something in his hands. She wrote down the license number of the car as the two men drove away. She gave the number to the police officers who came to the video store.

That same day, Officer Villanueva, who had investigated the theft of Penaloza's white car, observed a white Ford matching that description in an

alley near Hubbard and Amboy Streets. As he pulled in behind the car, Villanueva observed two men inside. They looked back at the police car, and then drove off. A chase followed, ending when the vehicle skidded to a stop at the end of an alley. Fernandez, who had been driving the car, opened the driver's door and reached down to grab what appeared to be the barrel of a sawed-off shotgun. Ziegler exited from the other side, the two men fled, and were ultimately cornered by backup units.

Fernandez and Ziegler were arrested and charged with robbery, assault with a deadly weapon, and grand theft auto. The information also included armed and use allegations as well as allegations of prior felony convictions. They were tried together, convicted as charged and Fernandez appeals.

## I

### COURTROOM IDENTIFICATIONS

■ Appellant asserts he was denied due process of law when the court permitted two witnesses to make identifications at trial after they had failed to attend a court-ordered lineup six months before trial. Corina Gomez, who was a witness to the robbery at Universal Video, failed to attend the court-ordered lineup on November 19, 1987, because she was six months pregnant. Cheri Petree, who was a witness to the collision involving the brown Camaro, also failed to attend that lineup because she was in her ninth month of pregnancy and had been advised by her doctor not to attend. Appellant moved to exclude in-court identification by these two witnesses based on their failure to comply with the court's order to attend the lineup. The court ruled that suppression of the identifications was not a proper remedy, but did permit counsel to fashion another remedy. Thus, the court gave a jury instruction drafted by defense counsel which read: "Certain witnesses that testified here failed to attend the line up, despite being requested to attend. You should view their testimony as to eyewitness identification with caution, as it may be less reliable than if they had attended the aforesaid line up." We find no error.

It is well established that "due process requires in an appropriate case that an accused, upon timely request therefor, be afforded a pretrial lineup in which witnesses to the alleged criminal conduct can participate." (*Evans v. Superior Court* (1974) 11 Cal.3d 617, 625 [114 Cal.Rptr. 121, 522 P.2d 681].) Here appellant was afforded his due process right to a pretrial lineup; the question arises as to what sanction was appropriate when certain witnesses failed to attend the court-ordered lineup. As the court noted in *Evans*, when a defendant is denied his right of discovery, the net effect is the same as if existing evidence were intentionally suppressed. (*Id.* at p. 625.)

■ "[T]he courts enjoy a large measure of discretion in determining the appropriate sanction that should be imposed because of the destruction of discoverable records and evidence." (*People* v. *Zamora* (1980) 28 Cal.3d 88, 99 [167 Cal.Rptr. 573, 615 P.2d 1361].) Factors to consider in making such a decision include whether the evidence was lost through bad faith destruction or through a proper and innocent act; whether the evidence could conclusively demonstrate innocence, or whether it merely impeaches a witness or is even immaterial; and what impact the sanction will have upon future cases and future police conduct. (*Id.* at pp. 100-101.) The public interest in law enforcement must also be considered in evaluating the appropriateness of a particular sanction. (*Id.* at p. 100.)

■ In this case, the "lost" evidence resulted from the failure of two witnesses to attend the court-ordered lineup. There was no indication whatsoever of bad faith by the prosecution. Although the evidence would clearly have been material, it is only speculation that it would have helped to establish appellant's innocence. This was also not a situation calling for a strong punitive element to deter future police suppression of evidence. The suppression in this case resulted from the failure of two witnesses to attend the lineup; it was not caused by any improper conduct of police or prosecutor, but by each witness's personal decision not to attend.

In light of these factors, appellant's requested sanction of exclusion of in-court identification by these two witnesses is too harsh a sanction. We find guidance in *People* v. *Ratliff* (1986) 41 Cal.3d 675, 690 [224 Cal.Rptr. 705, 715 P.2d 665], in which defendant claimed a pretrial identification was impermissibly suggestive. Police in that case negligently failed to preserve the photo lineup photographs, and defendant thus suggested that suppression of all identification testimony by that witness would be an appropriate sanction. The court explained that where the loss or destruction of photographs used in a pretrial identification is merely negligent, the usual remedy would be to suppress evidence of that identification; however, that loss of evidence does not require suppression of a subsequent in-court identification found to have been independently derived from the witness' recollection of the event, untainted by the photographic identification. Thus, the court approved as ample deterrent the remedy of allowing defendant to argue that the photo lineup was unduly suggestive.

In the present case the problem was not an unduly suggestive pretrial lineup, but no participation in the pretrial identification. There was no potential that the in-court identification would be tainted by a prior improper identification. Under these circumstances, we find adequate remedy was afforded by the giving of appellant's instruction regarding the failure of these two witnesses to attend the lineup and the need to view their

identification testimony with caution, along with evidence and argument on that same point.

Moreover, as the trial court explained, exclusion of in-court identification testimony as a sanction would have been improper in light of article I, section 28, subdivision (d) of the California Constitution, which provides that "relevant evidence shall not be excluded in any criminal proceeding" except as provided by statutory rules of evidence. "The express intent of section 28, subdivision (d) is to ensure that all relevant evidence be admitted. That purpose cannot be effectuated if the judiciary is free to adopt exclusionary rules that are not authorized by statute or mandated by the Constitution." (*In re Lance W.* (1985) 37 Cal.3d 873, 889 [210 Cal.Rptr. 631, 694 P.2d 744].) In the absence of such authority, the court was not empowered to exclude this testimony.

To the extent appellant's claim rests on an inability to prepare and present his defense of misidentification, we note he took no action in the six months between the lineup and trial to obtain compliance with the court order. At the preliminary hearing, although he objected to the testimony of another witness who had failed to attend the lineup, he rejected the court's invitation to move for a continuance in order to have the witness attend a lineup. Instead he simply moved to dismiss that count. It appears that appellant's failure to seek a remedy for the lack of attendance of the other two witnesses at the lineup may have been a tactical choice made in hopes of receiving the windfall remedy of exclusion of identification testimony at trial. We decline to reward him for his inaction.

## II

### CODEFENDANT AS WITNESS

■ Appellant contends he was denied due process of law when he was barred from calling as a witness his codefendant, who was willing to testify. This contention has merit.

The constitutional guaranty of due process includes the right of a criminal defendant to compel the presence of witnesses in his behalf. (*Washington v. Texas* (1967) 388 U.S. 14, 19 [18 L.Ed.2d 1019, 1023, 87 S.Ct. 1920].) In this case, when appellant sought to exercise that right by calling his codefendant Ziegler to testify, Ziegler's attorney objected on the basis that Ziegler's testimony could be harmful to Ziegler's own defense. The court and counsel acknowledged that Ziegler's right against self-incrimination is subject to a knowing, intelligent and voluntary waiver. The question argued was whether Ziegler could waive this privilege over his attorney's objection.

The trial court held that Ziegler's counsel had the right and duty to control Ziegler's defense, and thus Ziegler could not be called to testify on behalf of his codefendant without the consent and acquiescence of his counsel.

We disagree with the trial court's conclusion. ■ A criminal defendant's Fifth Amendment privilege against self-incrimination is a personal privilege held by the defendant, not by his counsel. (*People* v. *Harris* (1987) 191 Cal.App.3d 819, 825 [236 Cal.Rptr. 680].) The right to waive that privilege and testify in one's own behalf is of such fundamental importance that a defendant cannot be deprived of the opportunity to testify, even against the advice of counsel. (*People* v. *Robles* (1970) 2 Cal.3d 205, 214-215 [85 Cal.Rptr. 166, 466 P.2d 710].) Thus, the extent of a criminal attorney's control over the court proceedings is limited by a defendant's fundamental right to testify in his own behalf. (*Ibid.*; see also *People* v. *Frierson* (1985) 39 Cal.3d 803, 814 [218 Cal.Rptr. 73, 705 P.2d 396].)

The question we must resolve is whether a defendant's right to testify on behalf of his codefendant is also of such fundamental importance that it overrides his attorney's control of the proceedings. We conclude that it is. As the court observed in *People* v. *Harris, supra*, 191 Cal.App.3d 819: "[O]nce an accused has been made aware of his legal rights he, not his attorney, and certainly not the court, must decide whether his oral declarations to the jury will prove beneficial to him, even when they constitute a complete confession. [¶] While the truth may not immediately set free those who have violated the laws by which society governs itself, leniency often is extended to the truly repentant. . . ." (*Id.* at p. 824.) ■ In the face of proper advisements, we find no authority for depriving codefendant Ziegler of his opportunity to tell the truth to the jury, even if his testimony proved harmful to his own defense. (See *People* v. *Isenor* (1971) 17 Cal.App.3d 324, 335 [94 Cal.Rptr. 746].)

In ruling on this matter, the trial court found guidance in the capital cases of *People* v. *Chadd* (1981) 28 Cal.3d 739 [170 Cal.Rptr. 798, 621 P.2d 837] and *People* v. *Deere* (1985) 41 Cal.3d 353 [222 Cal.Rptr. 13, 710 P.2d 925]. In *Chadd*, the Supreme Court upheld the validity of a statute barring acceptance of a defendant's guilty plea to a capital charge without the consent of his counsel. (*People* v. *Chadd, supra*, 28 Cal.3d at pp. 750-751.) In *Deere*, the Supreme Court held that a capital defendant could not prevent his counsel from introducing mitigating evidence at the penalty phase of his trial. (*People* v. *Deere, supra*, 41 Cal.3d at p. 364.) Those cases were premised on the state's strong interest in capital cases of reducing the risk of mistaken judgments (*People* v. *Chadd, supra*, 28 Cal.3d at p. 751) as well as the fundamental public policy against misusing the judicial system to commit a state-aided suicide (*People* v. *Deere, supra*, 41 Cal.3d at p. 363). These

concerns are not present in our case, and we therefore find the trial court's reliance on those cases misplaced.[1]

The tension here was between codefendant Ziegler's constitutional privilege against self-incrimination and appellant's constitutional right to present witnesses in his defense. Ziegler resolved the conflict when he chose to waive his privilege. Whether Ziegler's counsel agreed or disagreed with that decision, Ziegler was the holder of that privilege and was entitled to knowingly and voluntarily waive it and testify. The trial court erred in precluding appellant from calling Ziegler as a witness.

■ This error does not, however, compel reversal. A defendant is denied his constitutional right to have compulsory process for obtaining witnesses in his favor when he is improperly precluded from putting on the stand a witness who is physically and mentally capable of testifying to events that he had personally observed and whose testimony would be relevant and material to the defense. (*Washington* v. *Texas, supra,* 388 U.S. 14, 23 [18 L.Ed.2d 1019, 1025, 87 S.Ct. 1920].) Thus, violation of the right to compulsory process or to due process based on deprivation of the right to interview or present a witness requires some showing that the evidence lost would be both material and favorable to the defense. (*United States* v. *Valenzuela-Bernal* (1982) 458 U.S. 858, 872-873 [73 L.Ed.2d 1193, 1205-1206, 102 S.Ct. 3440].)

In this case, appellant made no offer of proof as to Ziegler's expected testimony. Although the court was advised on numerous occasions that Ziegler wished to testify "on behalf of" appellant, appellant's counsel admitted that he had not had the chance to discuss the matter at all with Ziegler and so did not really know what Ziegler's testimony would be. Ziegler's counsel indicated to the court that he felt his client's testimony would not only be harmful to Ziegler's case, but also to appellant's case. This was clearly an inadequate showing to establish that the testimony would be material and favorable to the defense.

On appeal, appellant seeks to make the requisite showing by reference to the following statement in his probation report: "Defendant states that the codefendant Ziegler picked him up in order to purchase some heroin. Defendant mentions that codefendant had a 'couple of balloons' with him at the time and while they were on their way to make a purchase they stopped

---

[1] Moreover, the Supreme Court has recently reaffirmed that even in capital cases, both the court and defense counsel are obligated to respect a competent defendant's considered and voluntary decisions affecting trial of the action. (*People* v. *Bloom* (1989) 48 Cal.3d 1194, 1221-1223 [259 Cal.Rptr. 669, 774 P.2d 698]; *People* v. *Lang* (1989) 49 Cal.3d 991, 1030-1031 [264 Cal.Rptr. 386, 782 P.2d 627].)

in an alley in order to inject. Defendant admits to driving the vehicle as Ziegler had a head injury. Before he knew it, police arrived and he was placed under arrest. Defendant denies committing any robbery." This, however, is appellant's statement; it gives us no insight as to what Ziegler's testimony would have been. Appellant has failed to establish that Ziegler's testimony would have been both material and favorable, and thus has not established a violation of his Fifth or Sixth Amendment rights. (*United States* v. *Valenzuela-Bernal, supra,* 458 U.S. at p. 874 [73 L.Ed.2d at p. 1207].)

### III-XI*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

### DISPOSITION

The judgment is modified, and as modified, is affirmed.

Ashby, J., and Boren, J., concurred.

---

*See footnote, *ante,* page 1379.