Filed 12/23/21  In re J.C. CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re J.C., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>J.C.,<br><br>      Defendant and Appellant. | A161491<br><br>(Marin County<br>Super. Ct. No. JV-26982A) |

Following the denial of his motion to suppress evidence, minor J.C. admitted that he possessed a knife on school grounds (Pen. Code, § 626.10, subd. (a)), was declared a ward of the juvenile court (Welf. & Inst. Code, § 602, subd. (a)), and was admitted to probation upon specified conditions.[1] On appeal, J.C. claims the juvenile court (1) erred in denying his motion to suppress, (2) deprived him of his constitutional right to testify at the hearing on that motion, and (3) imposed an unconstitutionally overbroad curfew condition.  We reject the first and second claims, but agree with the third, and we conclude that the curfew condition should be modified in order to

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

avoid unconstitutional overbreadth.  As modified, we affirm the judgment.

## BACKGROUND

**The Facts[2]**

On March 11, 2020, the staff of San Rafael High School received a call from a senior home located three or four blocks away from the school with a report that students were smoking near the home and that the smell of marijuana was entering the home.  The call came in after the lunch hour, approximately when afternoon classes were starting.  Bennie Johnson, the school's head officer of campus security, left the campus to investigate the report.

As Johnson walked toward the senior home, he saw four to five male San Rafael High School students on the street, one of whom he identified as J.C.  As the group of students crossed Johnson's path, Johnson yelled to them stating, "[G]entlemen, I need you to come with me, come this way."  The students did not respond, continued to walk away from Johnson and toward the school, and then started to run.  At this point, the students were late for their afternoon class.

When Johnson returned to the campus, he did not immediately pursue J.C. and the other students; instead, he went to the counseling office to look up their class schedules.  Johnson then went into the classrooms where the students were, removed each of them, including J.C., out of class, and walked them to the assistant principal's office.  Approximately 15 to 25 minutes had elapsed between the time the students had fled from Johnson on the street and when they were pulled out of class.

As Johnson and the students were walking to the assistant principal's

---

[2] We derive the facts from the motion to suppress hearing, at which security officer Bennie Johnson was the only witness.

2

office, one of the students (not J.C.) passed off an item to another student who was passing by. Johnson discovered the object was a vaporizer pen. Johnson confiscated the vaporizer, along with the students' backpacks. When they reached the office, Johnson noticed that all four students, including J.C., smelled like marijuana and that their "eyes were bloodshot red a little." Based on his training and experience working over 20 years as a school official, Johnson determined that J.C. and the other students were under the influence of marijuana.

Johnson was asked to take J.C. to the principal's office, where J.C. was then asked to empty his pockets. J.C. complied and placed several items on a table. Among those items was a knife.

**The Proceedings Below**

On July 7, 2020, the Marin County District Attorney filed a juvenile wardship petition under section 602 charging J.C. with possessing a weapon on school grounds (Pen. Code, § 626.10, subd. (a)).

On September 10, J.C. filed a motion to suppress evidence of the knife obtained on March 11 (§ 700.1). The People filed an opposition, and J.C., a reply. On September 30, the juvenile court held a hearing on the motion, at which Johnson was the sole witness. After hearing Johnson's testimony and argument from the parties, the court found Johnson's testimony was credible given "his experience, training, and history" and denied the suppression motion.

On October 9, the District Attorney filed an amended wardship petition, charging J.C. with possessing a weapon on school grounds (Pen. Code, § 626.10, subd. (a)) in addition to two other offenses that allegedly occurred after the present offense and are not at issue in this appeal.

3

On October 26, J.C. admitted to the allegation that he possessed a knife on school grounds. And at the dispositional hearing on November 9, the juvenile court declared J.C. a ward of the court and placed him on probation for one year. The court imposed several conditions of probation, including that J.C. obey a daily curfew between 8:00 p.m. and 6:00 a.m.

J.C. filed a timely notice of appeal.

## DISCUSSION

### The Motion to Suppress

J.C. first contends the juvenile court erred in denying his motion to suppress evidence because there was no reasonable suspicion to justify the search. We disagree.

#### *The Law*

The Fourth Amendment protects public school students from unreasonable searches and seizures by campus personnel. (*New Jersey v. T.L.O.* (1985) 469 U.S. 325, 334–335 (*T.L.O.*); *In re William G.* (1985) 40 Cal.3d 550, 561 (*William G.*).) But because " 'special needs' inhere in the public school context," "Fourth Amendment rights . . . are different in public schools than elsewhere." (*Board of Education of Independent School Dist. No. 92 of Pottawatomie County v. Earls* (2002) 536 U.S. 822, 844.) Student searches thus need not strictly adhere to the requirements of obtaining a warrant or be based on probable cause. (*T.L.O.*, *supra*, 469 U.S. at pp. 340–341.)

"Rather, the legality of a search of a student should depend simply on the reasonableness, under all circumstances, of the search." (*T.L.O.*, *supra*, 469 U.S. at p. 341.) "[S]earches of students by public school officials must be based on a reasonable suspicion that the student or students to be searched have engaged, or are engaging, in a proscribed activity (that is, a violation of

4

a school rule or regulation, or a criminal statute)." (*William G.*, *supra*, 40 Cal.3d at p. 564; accord, *T.L.O.*, at p. 376.) "[T]his standard requires articulable facts, together with rational inferences from those facts, warranting an objectively reasonable suspicion that the student or students to be searched are violating or have violated a rule, regulation, or statute." (*William G.*, at p. 564.) "The corollary to this rule is that a search of a student by a public school official is unlawful if predicated on mere curiosity, rumor, or hunch." (*Ibid.*)

"On appeal from the denial of a suppression motion, the court reviews the evidence in a light favorable to the trial court's ruling. [Citation.] We must uphold those express or implied findings of fact by the trial court which are supported by substantial evidence and independently determine whether the facts support the court's legal conclusions. [Citation.]" (*In re Joseph G.* (1995) 32 Cal.App.4th 1735, 1738–1739.)

### *The Juvenile Court Properly Denied the Suppression Motion*

At the hearing on the motion to suppress, the school's head security officer Johnson testified to the following facts: (1) the school received a report that students were smoking marijuana near a senior home located blocks away; (2) Johnson spotted a group of students, including J.C., near the senior home; (3) the students ran away from Johnson after he called out to them; (4) the students were already late for class at the time of this encounter; (5) one of the students had a vaporizer pen; and (6) J.C. had bloodshot eyes and smelled like marijuana, which Johnson testified was indicative of being under the influence of marijuana. We conclude that the totality of these facts, together with all rational inferences from those facts, provided reasonable suspicion that J.C. was late for class, in violation of school rules,

and that he was smoking marijuana, in violation of the law (see Health & Saf. Code, § 11357) and school rules.

J.C. nonetheless insists that the search was not justified "at its inception." He first focuses on the events prior to Johnson removing him from class, the point at which he claims the "search of [him] and the other children began." J.C. contends at that point, Johnson "only witnessed one rule violation prior to removing the children from their classes — they had been tardy for class following their lunch break." Tardiness alone, J.C. says, "cannot justify a search by school officials." We are unpersuaded.

J.C. does not explain how Johnson's removal of him from his classroom constituted a search for purposes of the Fourth Amendment, and, in any event, we disagree with that characterization. Nor does the removal of J.C. from class "seem to qualify as a detention as defined by the Fourth Amendment." (*In re Randy G.* (2001) 26 Cal.4th 556, 564 (*Randy G.*).) As explained by our Supreme Court, not every encounter between a student and school personnel implicates the Fourth Amendment. When a school official sends students to the office or takes them into the hallway to ask a question, for instance, "it would appear that the student's liberty has not been restrained over and above the limitations he or she already experiences by attending school." (*Id.* at p. 563.) But assuming such encounters qualify as detentions, the *Randy G.* court held that "detentions of minor students on school grounds do not offend the Constitution, so long as they are not arbitrary, capricious, or for the purposes of harassment. [Citations.] Reasonable suspicion . . . . need not be shown." (*Id.* at p. 567.)

Here, assuming J.C. was detained when he was removed from class, we would conclude the detention was lawful under *Randy G.* Contrary to J.C.'s assertions, the facts known at the time of his removal from class included not

6

only that J.C. was late for class, but also that he was found near the senior home where students were reportedly smoking marijuana and fled from Johnson when he called out to him. On these facts, removing J.C. from class and taking him to the principal's office was not arbitrary, capricious, or for the purpose of harassment.

J.C. then turns to facts that the juvenile court relied upon to find reasonable suspicion justified the search of J.C. in the principal's office. These included that: (1) Johnson saw J.C. near the senior home while investigating a report that students were smoking marijuana near the home; (2) J.C. and the other students ran away from Johnson; (3) a vaporizer was found on one of the students; and (4) J.C. and the students smelled like marijuana. J.C. argues "[e]ach of these facts is either not supported by substantial evidence, irrelevant to a Fourth Amendment analysis, or both." As now explained, these contentions are not well taken because they require us to either view each of the facts above in isolation at the exclusion of all other relevant facts or to make credibility assessments in his favor.

As to the first factual finding above—that Johnson saw the students near the senior home—J.C. argues there is no substantial evidence to support it. J.C. explains that according to Johnson's testimony, both the school and the senior home are located on Mission Avenue in San Rafael. Johnson had walked down Mission Avenue and turned right onto Park Street, where he testified he saw J.C. and the other students walking on Belle Avenue. J.C. argues, "Based on these facts, Mr. Johnson could not possibly have seen the children at the senior home because he never reached the location: he was not even on the same street as the senior home when he first saw the children, nor was he within sight distance of the building." To support this contention, J.C. cites to a printout from GoogleMaps, which purportedly

7

depicts the area covering both the school and the senior home and which he asks us to take judicial notice of.

Preliminarily, we deny the request for judicial notice. As the People note, the evidence was not presented in or considered by the juvenile court. (See *People v. Hardy* (1992) 2 Cal.4th 86, 134.) In any event, even if we took judicial notice of the map, it does not create a conflict with Johnson's testimony. If, as J.C. argues, Johnson did not reach the senior home or was not on the same street as the students, these facts do not necessarily refute his testimony that he saw the students near the senior home. And even if the map conflicts with Johnson's testimony, J.C.'s argument misperceives our role in reviewing the court's finding for substantial evidence. The question is whether there is substantial evidence supporting the court's finding, not whether there is any evidence that would support a finding contrary to the one made by the court. (See *People v. Zamudio* (2008) 43 Cal.4th 327, 342 (*Zamudio*) ["If there is conflicting testimony, we must accept the trial court's resolution of disputed facts and inferences, its evaluations of credibility, and the version of events most favorable to the People, to the extent the record supports them"].) Here, there is substantial evidence to support the court's decision to credit Johnson's testimony.

J.C. argues that even if substantial evidence supported the finding that Johnson saw J.C. near the senior home, J.C.'s "mere proximity to the senior home" is insufficient to support the search. We disagree. As the People note, a student's location in an area where students have been reported to violate school rules can contribute to reasonable suspicion. *In re Bobby B.* (1985) 172 Cal.App.3d 377 is analogous. There, the court held there was reasonable suspicion to justify the search of student who was located in a restroom where reports of marijuana activity occurred, did not have a pass to be out of

class at the time the school dean found him there, and "appeared to be searching for or faltering in answering the simple questions." (*Id.* at p. 380.) Similarly, here, J.C. was found in a location where students were reportedly smoking marijuana at a time he was not permitted to be there. But beyond J.C.'s proximity to senior home, the record reveals additional facts that also supported a reasonable suspicion he was violating the law or school rules.

This leads us to J.C.'s challenge to another factual finding that the court made: that the children ran away from Johnson when he called out to them on the street. According to J.C., substantial evidence does not support this finding. Whereas Johnson testified that the children "ran" away when he called out to them, the probation officer's summary of the incident in the diversion suitability report states that the students "continued to walk towards the school." J.C. maintains, "In light of this contradiction, the juvenile court's finding that [J.C.] ran from Mr. Johnson, or from the scene, is not supported by substantial evidence." Again, J.C.'s argument is essentially asking us to credit the report over Johnson's testimony, an invitation we decline. (See *Zamudio*, *supra*, 43 Cal.4th at p. 342.)

Even if there was sufficient evidence that J.C. "ran" away from Johnson, J.C. argues, this fact is "irrelevant to a Fourth Amendment analysis." He explains that because Johnson's authority over him and the other students "ceased to exist . . . as soon as [Johnson] crossed the campus border," he was free to disregard Johnson's commands. These contentions lack merit. For one, nothing in *Randy G.*, *supra,* 26 Cal.4th 556, a case J.C. cites, suggests the proposition that a public school official loses authority in enforcing school rules and over students still entrusted in its care "as soon as [that official] crosses the campus border." And J.C.'s reliance on *Florida v. Bostick* (1991) 501 U.S. 429 to argue he "had every right" not to comply with

9

Johnson's requests is misplaced. Insofar as *Florida v. Bostick* addressed the question of when a police encounter with an individual on the street becomes a seizure within the meaning of the Fourth Amendment, it is legally and factually inapplicable. (*Id.* at p. 434.)

In short, J.C. provides no authority establishing it was inappropriate for the juvenile court to consider his flight at the sight of Johnson as a factor in its reasonable suspicion analysis. To the contrary, cases have found that flight at the presence of a stranger or police officer is a pertinent factor in determining reasonable suspicion. (See, e.g., *Illinois v. Wardlow* (2000) 528 U.S. 119, 124 ["Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such"]; *Sibron v. New York* (1968) 392 U.S. 40, 66–67 ["deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest"]; *People v. Jiminez* (1956) 143 Cal.App.2d 671, 674 [furtive motion "is a natural impulse on confrontation to hide immediately any contraband"].)

Next, J.C. asserts substantial evidence does not support the court's additional factual finding that J.C. smelled of marijuana. Citing an online blog post, J.C. argues that Johnson's testimony "is not credible" because "vaporizer cartridges produce far less of a smell than smoking cannabis." Putting aside the question of the blog post's evidentiary competence, J.C.'s contention is yet another request that we reweigh the evidence in his favor. And again, we decline to do so.

Finally, J.C. contends that the court erred in relying on the fact that one of the other students in J.C.'s group had a vaporizer, as it "is irrelevant to

10

a Fourth Amendment analysis." While we agree that this fact by itself might not necessarily supply reasonable suspicion to search J.C., he ignores the numerous other facts known at the time of the search. As the court determined, the discovery of the vaporizer, the report of students smoking marijuana near the senior home, J.C.'s location near the senior home, his flight at the sight of Johnson, and the smell of marijuana on his person "combined [to] create reasonable suspicion." And J.C. does not challenge the court's consideration of the totality of the circumstances in making its determination.

For this reason, we reject J.C.'s attempt to analogize his case to *William G.*, *supra*, 40 Cal.3d 550. There, the assistant principal stopped the minor who was late for class and questioned him when he noticed he was carrying a small black case with an "odd-looking bulge." (*Id.* at p. 555.) When confronted, the minor tried to hide the bag and stated he had " '[n]othing.' " (*Ibid.*) On those facts, the California Supreme Court held that the minor's conduct did not support a reasonable suspicion and justify a search that revealed evidence of marijuana use and dealing. (*Id.* at pp. 566–567.) The Court explained, "The record reflects a complete lack of *any prior* knowledge or information on the part of [the assistant principal] relating William to the possession, use, or sale of illegal drugs or other contraband. [Citations.] [The assistant principal's] suspicion that William was tardy or truant from class provided no reasonable basis for conducting a search of any kind." (*Id.* at p. 566.) Here, in contrast, we have already explained above that the record reveals evidence beyond J.C.'s tardiness or furtive gestures that supported a reasonable suspicion of proscribed activity.

In sum, we conclude that the juvenile court's factual findings were supported by substantial evidence and its determination that the totality of

11

the facts supplied reasonable suspicion to justify the search was sound.  The court did not err in denying J.C.'s motion to suppress.

**The Right to Testify**

J.C. next asserts that the juvenile court deprived him of his constitutional right to testify at the hearing on his suppression motion.  Again, we disagree.

*Background*

During cross-examination of Johnson at the suppression hearing, which was conducted via video conference, J.C.'s attorney questioned Johnson about a prior incident that allegedly involved J.C. possessing a weapon at school.  The following exchange occurred:

"Q.  So you encountered him having a weapon on campus before?

"A.  Yes.

"Q.  All right.  When was that?

"A.  I don't recall the exact time or date, but there were other circumstances.

"Q.  Did you ever—

"THE MINOR:  Can I say something, your Honor?

"DEFENSE COUNSEL:  No.

"THE COURT:  No, [J.C.], you can't.  It's not how it goes.

"THE MINOR:  Why can't I say something because I—

"THE COURT:  [J.C.], [J.C.], [J.C.], [J.C.], [J.C.], stop—

"THE MINOR:  Ask me—

"THE COURT:  [J.C.]—

"THE MINOR:  Ask me—

"THE COURT: —that's not how it goes. This witness is being questioned. If your attorney wants to call you as a witness, then you'll have that chance, but you don't interrupt other witnesses.

"THE MINOR: All right. But I'm not having a voice to speak and—

"THE COURT: No, you can't, because it's not your turn. It's not your turn.

"THE MINOR: —lies—

"THE COURT: [J.C.]

"THE MINOR: —he's coming after me with another weapon—

"THE COURT: [J.C.], [J.C.], stop.

"THE MINOR: I'm telling the truth. I'm saying the truth, because it's false.

"THE COURT: Okay. Mr. Devine, I'm going to have to remove [J.C.] from the proceeding if he doesn't stop interrupting the witness.

"DEFENSE COUNSEL: Well, I think we can just—

"THE WITNESS: Well—

"DEFENSE COUNSEL: I would agree just to mute [J.C.]

"THE COURT: Okay.

"DEFENSE COUNSEL: Then we can proceed with, and he can—

"THE COURT: Go ahead."

At the conclusion of Johnson's testimony, the juvenile court asked J.C.'s attorney if he intended to call any witnesses and he replied, "No." The court then indicated it needed to take brief recess to hear other matters on calendar. Responding to the court's question on when the parties should reconvene, J.C.'s attorney stated, "We can go back to the same zoom at 11:00 . . . . That way, I can talk to [J.C.] separately . . . . on the phone, without the zoom." The recess lasted for 43 minutes. When the matter was

13

recalled, the court asked J.C's attorney, "I understood from our last conversation that you did not intend to call any witnesses?" J.C.'s attorney replied, "That's correct."

Subsequently, the court addressed J.C. directly as follows:

"THE COURT: . . . . And I want [J.C.] to understand, it's not that I don't want to hear from you, [J.C.]. But it in [*sic*] these proceedings, witnesses are called, and your attorney has elected not to call you, and that's a decision for the two of you to make. So it's not that I don't want to listen to you; it's just that decision was made. Got it? Do you understand, [J.C.]?"

"THE MINOR: Yes, your Honor."

### *The Law*

A defendant in a criminal case has a constitutional right to testify in his or her own behalf. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1053 (*Bradford*).) "[T]he decision to place a defendant on the stand is ordinarily within the competence and purview of trial counsel, but . . . a defendant who insists on testifying may not be deprived of doing so even though counsel objects." (*People v. Hayes* (1991) 229 Cal.App.3d 1226, 1231 (*Hayes*).) However, "[w]hile the defendant has the right to testify over his attorney's objection, such right is subject to one significant condition: The defendant must timely and adequately assert his right to testify." (*Ibid.*; accord, *People v. Alcala* (1992) 4 Cal.4th 742, 805–806 (*Alcala*).) Without such an assertion, a trial court is not required to "obtain an affirmative waiver on the record whenever a defendant fails to testify at trial" and " ' "may safely assume that a defendant, who is ably represented and who does not testify[,] is merely exercising his Fifth Amendment privilege against self-incrimination and is abiding by his counsel's trial strategy." ' " (*Alcala*, *supra*, 4 Cal.4th at p. 805.) A defendant who fails to make a timely and adequate demand to

testify will not be permitted to "await the outcome of the trial and then seek reversal based on his claim that despite expressing to his counsel his desire to testify, he was deprived of that opportunity." (*Hayes*, *supra*, 229 Cal.App.3d at pp. 1231–1232.)

### *J.C. Was Not Denied the Right to Testify*

According to J.C., he made a timely request to testify when he twice interrupted Johnson's testimony during cross-examination and asked the court if he could speak. He argues that his request also was adequate, as his "demands to testify were . . . clear enough to inform the juvenile court that he wished to be heard." The People counter that J.C. "did not put forth a timely and adequate demand to testify" and thus "is bound by his counsel's decision not to call him at a witness." We agree with the People.

As the People observe, this case is factually similar to *Hayes*, *supra*, 229 Cal.App.3d 1226. There, at trial, the defendant engaged in several outbursts during the course of the victim's testimony, in which he expressed anger, interrupted the victim's testimony by interjecting claims the testimony was biased or untrustworthy, and attempted to cross-examine the victim directly and/or argue his case. (*Id.* at p. 1232.) The court found that the defendant's statements during cross-examination, including that he wanted "to speak on [his own] behalf," were "somewhat amorphous statement[s]" that "could be construed in various ways (including [his] desire to be allowed to cross-examine the witness personally or to give his own closing argument), but does not reflect a clear and timely assertion of his desire to take the witness stand." (*Id.* at p. 1232, fn. 9.) The court thus held that the defendant's "equivocal statements do not constitute an 'adequate' or 'timely' assertion of a defendant's right to testify, particularly on this record, where counsel subsequently represents he never had any intention of calling [the

15

defendant] as a witness." (*Id.* at p. 1232.) The defendant was therefore "bound by his counsel's decision and must seek relief, if any is due, by showing ineffective assistance of counsel." (*Ibid.*)

J.C.'s interjections and statements during the cross-examination of Johnson mirror those made by the defendant in *Hayes*. As in *Hayes*, J.C. interrupted Johnson's testimony with a request to "say something," followed by accusations that Johnson was lying, which statements did "not reflect a clear and timely assertion of his desire to take the witness stand." (*Hayes*, *supra*, 229 Cal.App.3d at p. 1232 & fn. 9.) In sum, we conclude that J.C. did not make a timely and adequate demand to testify on his own behalf and thus the juvenile court was free to " ' "assume that [J.C.], who is ably represented and who does not testify[,] is merely exercising his Fifth Amendment privilege against self-incrimination and is abiding by his counsel's trial strategy." ' " (*Alcala*, *supra*, 4 Cal.4th at p. 805.)

For this reason, we reject J.C.'s contention that the juvenile court erred when it did not allow him to testify over his attorney's objections. Relying on *People v. Harris* (1987) 191 Cal.App.3d 819 (*Harris*), *People v. Allen* (2008) 44 Cal.4th 843, and *United States v. Gillenwater* (9th Cir. 2013) 717 F.3d 1070 (*Gillenwater*), J.C. argues that the court "was faced with a conflict between a defendant and his counsel" and that it should not have overridden his wishes to testify in favor of his attorney's decision not to call him as a witness. J.C.'s argument is premised on his assumption that the court was aware that such a conflict existed. But this assumption is unfounded. For the court to have been aware of a conflict, it first had to have been aware of J.C.'s desire to take the stand, which, as explained, the record does not disclose.

16

*Harris*, *Allen*, and *Gillenwater* are distinguishable on this point. In each case, there was an obvious conflict between the defendant, who had expressly informed the court that he wished to testify on his own behalf, and his attorney, who objected to that request. (*Harris*, *supra*, 191 Cal.App.3d at pp. 821, 822–823; *Allen*, *supra*, 44 Cal.4th at pp. 856–857; *Gillenwater*, *supra*, 717 F.3d at pp. 1074–1075, 1080.) The reviewing court held that the defendant was deprived of his constitutional right to testify when the trial court yielded to counsel's objections and proceeded without allowing the defendant to testify. (*Harris*, at pp. 825–826; *Allen*, at pp. 869–870; *Gillenwater*, at pp. 1080–1083.) Here, in contrast, J.C. did not clearly demonstrate that he wished to testify despite his counsel's advice and that the juvenile court thus was apprised of a desire to do so. As such, we disagree with J.C. that the court was faced with a "conflict" between J.C. and his attorney and that it "had a clear legal duty to allow [him] to testify over defense counsel's objection."

We also reject J.C.'s argument that the court "misadvised" him by suggesting that the decision whether he should testify belonged solely to his attorney. He points to the court's comments that "[i]f your attorney wants to call you as a witness, then you'll have that chance," that the decision to testify was "for the two of [them] to make," and that when J.C. was not called as a witness by his attorney, "that decision was made." We do not read the court's statements to J.C. in the same way he does. Instead, it appears the court appropriately conveyed to J.C. that whether to testify was a substantive decision that should be made after consultation with counsel. (See *Bradford*, *supra*, 14 Cal.4th at p. 1053 [a defendant's right to testify "must be exercised with caution and good judgment, and with the advice and under the direction of competent trial counsel"]; see also *People v. McKenzie* (1983) 34 Cal.3d 616,

17

631, fn. 9 ["Of course, substantive decisions as to . . . whether to testify are ultimately to be made by the defendant after consultation with counsel"].) And here, the record indicates that J.C.'s attorney sought, and had time, to consult with J.C. during a recess, after which his attorney reiterated to the court that no witnesses would be called.  There is thus no reason to assume that J.C. did not have an opportunity to consult with his attorney on whether he should testify.  Moreover, the court's comments also reflect that it was operating under the assumptions that J.C. was " ' "ably represented and who does not testify[,] is merely exercising his Fifth Amendment privilege against self-incrimination and is abiding by his counsel's trial strategy." ' " (*Alcala, supra*, 4 Cal.4th at p. 805.)  As explained, these are assumptions that the court was free to make in the absence of a timely and adequate demand to testify.  (*Ibid.*)

Accordingly, we conclude that the juvenile court did not deprive J.C. of his constitutional right to testify.[3]

**The Curfew Condition of Probation**

Finally, J.C. challenges as constitutionally overbroad the condition of probation that he "[o]bey a daily curfew" between 8:00 p.m. and 6:00 a.m.

The People contend J.C. has forfeited this challenge by failing to object to the curfew condition in the juvenile court.  J.C. acknowledges that he did not raise the overbreadth issue before the juvenile court, but he argues that the issue " 'presents a "pure question of law that can be resolved without reference to the particular sentencing record." ' " (See *In re Sheena K.* (2007) 40 Cal.4th 875, 889 (*Sheena K.*).)  We disagree with his characterization of his claim but nevertheless exercise our discretion to reach the issue.  (See

---

[3] Because we find no error on this ground, we need not address the parties' arguments analyzing prejudice.

18

*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6; *In re P.O.* (2016) 246 Cal.App.4th 288, 297–298.)

The juvenile court has broad discretion to impose probation conditions "that it may determine fitting and proper to the end that justice may be done and the reformation and rehabilitation of the ward enhanced." (§ 730, subd. (b); *Sheena K.*, *supra*, 40 Cal.4th at p. 889.) However, the juvenile court's discretion is not unlimited: the court may not order probation conditions that are unconstitutionally overbroad. (See *Sheena K.*, at p. 890; see also *People v. O'Neil* (2008) 165 Cal.App.4th 1351, 1356 ["Judicial discretion to set conditions of probation is . . . circumscribed by constitutional considerations"].) A probation condition is unconstitutionally overbroad if it imposes limitations on the probationer's constitutional rights and is not narrowly tailored and reasonably related to the compelling state interest in reformation and rehabilitation. (See *Sheena K.*, at pp. 889, 890.) "The essential question in an overbreadth challenge is the closeness of the fit between the legitimate purpose of the restriction and the burden it imposes on the defendant's constitutional rights." (*In re E.O.* (2010) 188 Cal.App.4th 1149, 1153.)

Because juveniles require more guidance than adults do, and their constitutional rights are more limited, it may be appropriate for the juvenile court to impose a probation condition on a minor that would be improper or unconstitutional if imposed on an adult. (*In re Victor L.* (2010) 182 Cal.App.4th 902, 910, disagreed with on another ground in *People v. Patel* (2011) 196 Cal.App.4th 956, 960.) Thus, the juvenile court may impose a condition that infringes on constitutional rights, as long as that condition is tailored specifically to meet the needs of the juvenile. (See *In re Antonio R.* (2000) 78 Cal.App.4th 937, 941.) "Whether a probation condition is

unconstitutionally overbroad presents a question of law reviewed de novo." (*In re P.O.*, *supra*, 246 Cal.App.4th at p. 297.)

Here, the challenged condition is a requirement that J.C. obey a daily curfew between 8:00 p.m. and 6:00 a.m. Section 729.2, subdivision (c) (section 729.2(c)) provides that when a minor is granted probation and is released to the custody of his or her parents, the juvenile court shall "[r]equire the minor to be at his or her legal residence between the hours of 10:00 p.m. and 6:00 a.m. unless the minor is accompanied by his or her parent or parents, legal guardian or other adult person having the legal care or custody of the minor." It has been said that section 729.2 "serve[s] as a floor, not a ceiling, for juvenile probation conditions." (*In re Walter P.* (2009) 170 Cal.App.4th 95, 99.)

The curfew condition here is more restrictive than that required in section 729.2(c). It requires J.C. to obey a curfew that starts earlier in the evening at 8:00 p.m. J.C. argues that the more restrictive curfew condition is unconstitutionally overbroad because it impinges on his constitutional rights to travel and freely associate, and was not narrowly tailored to address the state's compelling interest in his reformation. The People do not dispute that the condition implicates J.C.'s constitutional rights. However, they argue that the juvenile court properly determined the condition was warranted in light of the nature of J.C.'s present offense, his failing grade point average, chronic truancy, disrespect toward school authorities, and involvement in physical fights at school.

While some infringement of J.C.'s rights was justified based on the facts cited by the People and the juvenile court, we conclude the curfew condition here sweeps too broadly in light of the purpose it is designed to serve. The condition is not narrowly tailored for the purposes of public safety

20

and rehabilitation. A curfew that starts at 8:00 p.m., as opposed to 10:00 p.m., is likely to interfere with J.C.'s ability to work at his job at the grocery store alongside his older sister, play recreational sports such as football, and participate in outside activities such as walks with his younger sister, whom he takes care of after school—activities that no one disputes help promote J.C.'s rehabilitation and preserve his family ties. We thus conclude the curfew condition was not tailored specifically to meet the needs of J.C.

J.C.'s circumstances are thus different from those in other cases relied upon by the People, in which more restrictive curfew conditions have been upheld. In *In re Laylah K.* (1991) 229 Cal.App.3d 1496, the appellate court found a curfew between 8:00 p.m. and 5:00 a.m. was "wisely tailored" to provide structure that was lacking at home for a minor who ran away from home, was affiliated with a gang, admitted to alcohol and marijuana use, and lacked parental supervision. (*Id.*, at pp. 1499, 1502–1503.) And in *In re Jason J.* (1991) 233 Cal.App.3d 710, overruled on another ground in *People v. Welch* (1993) 5 Cal.4th 228, 237, a curfew from "dark" to 6:00 a.m. was tailored to gang involvement by, and the need for greater parental supervision of, a minor who committed a robbery after dark. (*Id.* at p. 719.) Here, in contrast, J.C.'s present offense was not committed during night time hours, he was not a runaway, and was not involved in a gang.[4] Moreover, as noted, J.C. was engaged in pro-social activities outside of school hours.

J.C. argues that the curfew condition is overbroad also because it prohibits him from leaving his home during curfew hours even when

_____

[4] J.C. reported that he kept a knife in order to protect himself from a gang member who was targeting him, but there was no evidence that he himself was involved in a gang.

21

accompanied by a parent.  Both parties recognize a parent-accompaniment exception accords with section 729.2(c), which, as noted, provides that a juvenile court shall require a curfew between 10:00 p.m. and 6:00 p.m. "unless the minor is accompanied by his or her parent or parents, legal guardian or other adult person having the legal care or custody of the minor." There is no evidence in the record to indicate that the juvenile court considered J.C.'s mother and stepfather to be unsuitable in any way to accompany him outside the home during the curfew hours.  The People do not object to carving out a curfew exception for when J.C. is out with a parent. We agree the exception should thus be added.

In the interests of judicial economy and with the guidance of section 729.2(c), we will modify the condition as requested by J.C. to provide as follows:  "You are required to be at your legal residence between the hours of 10:00 p.m. and 6:00 a.m., unless accompanied by a parent or legal guardian."[5]

## DISPOSITION

The curfew condition is modified to state:  "You are required to be at your legal residence between the hours of 10:00 p.m. and 6:00 a.m., unless accompanied by a parent or legal guardian."  With this modification, the judgment is affirmed.

---

[5] In light of our conclusion, we do not consider J.C.'s additional claim that the court erred in failing to state its reasons for imposing the curfew condition, in violation of section 729.2.

_____

Richman, Acting P.J.

We concur:

_____

Stewart, J.

_____

Miller, J.

*In re J.C.* (A161491)